**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**SHEMELA THOMAS**                                                                 **PLAINTIFF**

**v.**                                     **Case No. 4:20-CV-01486-LPR**

**AUNDREA CULCLAGER**, individually
**and in her official capacity; and WILLIAM PIERCE**,
individually                                                                      **DEFENDANTS**

<u>**ORDER**</u>

Plaintiff Shemela Thomas was a prison correctional officer for the Arkansas Department of Corrections.  She had one particularly bad day at work.  It began almost immediately upon her arrival to start her shift.  A routine x-ray scan conducted in the prison entry area revealed a foreign object in her pelvic region.  She explained that it was a tampon.  Nonetheless, she was strip-searched, interrogated by the prison Warden, and physically detained by her fellow prison guards.  According to the Warden and Deputy Warden of the prison (Defendants in this case), Ms. Thomas behaved unprofessionally during these events.  A few days later, she was fired.

Ms. Thomas says that Defendants violated the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.  Specifically, she says that she was (1) retaliated against for speech protected by the First Amendment, (2) subjected to an unreasonable search and seizure, (3) retaliated against for invoking her right to remain silent, and (4) fired without receiving due process of law.  Ms. Thomas also claims that Defendants' conduct violated a litany of Arkansas state laws.

Defendants have moved for summary judgment.  They say they did nothing unlawful.  They also say that they are immune from suit under the doctrine of qualified immunity.  For the reasons below, the Court GRANTS in part and DENIES in part Defendants' Motion.

## BACKGROUND[1]

On October 25, 2020, Ms. Thomas's workday started like any other.  She arrived at the ADC's Cummins unit at approximately 5:30 a.m.[2]  She was a correctional officer assigned the 6:00 a.m. to 6:00 p.m. shift.[3]  Upon entering the facility, Ms. Thomas began to go through the ADC's standard entry procedures.  The entry procedures were in place to prevent contraband from being smuggled into the prison.[4]  Ms. Thomas first handed her shoes, belt, and other personal items to a fellow officer so that those items could be put through a scanner.[5]  Ms. Thomas then passed through a metal detector.[6]  Next, Ms. Thomas "g[o]t on a body scanner."[7]  The body scanner was a machine that "screen[ed] an individual for both metallic and non-metallic contraband that may be concealed under clothing or within the body."[8]  Essentially, it is a full-body x-ray scan.[9]

This is where Ms. Thomas's day took a turn for the worse.  After being scanned, Ms. Thomas was "told to get back on because" Sergeant Angela Haynie, who was operating the body scanner that morning, noticed "a[n] object."[10]  Sergeant Haynie saw the same object the second time around.[11]  Sergeant Haynie called two other officers—Captain Antonio Johnson and

---

[1] This Background Section is based primarily on undisputed facts.  To the extent there are any genuine disputes of fact, the Court resolves those disputes in favor of Ms. Thomas at this stage of the litigation.  *See Rorie v. United Parcel Serv., Inc.*, 151 F.3d 757, 760 (8th Cir. 1998).

[2] Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 13:13–17, 66:18–69:7; Ex. 11 (Entry Video) to Defs.' Mot. for Summ. J. (Doc. 37-11) at 5:32:15–5:32:20.

[3] Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 13:23–14:3.

[4] *See generally* Ex. 6 (AD 19-25) to Defs.' Mot. for Summ. J. (Doc. 37-6).

[5] Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 16:18–17:14.

[6] *Id.* at 18:9–16.

[7] *Id.* at 18:16.

[8] Ex. 6 (AD 19-25) to Defs.' Mot. for Summ. J. (Doc. 37-6) at 3.

[9] *See* Ex. 16 (Body Scanner Images) to Defs.' Mot. for Summ. J. (Doc. 37-16).

[10] Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 18:20–24; *see also* Ex. 2 (Termination Docs.) to Defs.' Mot. for Summ. J. (Doc. 37-2) at 29 (Sergeant Haynie's statement).

[11] Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 19:10–20:10.

Lieutenant Latoya Johnson—for advice.[12]   After viewing the body scanner images, Captain Johnson began speaking with Ms. Thomas.[13]   In an effort to explain the body scanner images, Ms. Thomas informed Captain Johnson that Ms. Thomas "was on [her] cycle and [she] had a tampon inside of [her]."[14]   Captain Johnson replied, "Hold on," and Ms. Thomas sat down on a table near the body scanner.[15]   The other Johnson—Lieutenant Johnson—called Deputy Warden Robert Pierce (one of the two Defendants in this case) to report Ms. Thomas's scans.[16]   While Ms. Thomas waited, she got a drink and a snack from a nearby vending machine.[17]   She also sarcastically asked Lieutenant Johnson whether Ms. Thomas should take out her tampon and give it to Lieutenant Johnson right there in the entry area.[18]

Then Deputy Warden Pierce arrived on the scene.[19]   Ms. Thomas had met Deputy Warden Pierce before, but she was not personally familiar with him.[20]   Deputy Warden Pierce reviewed the body scanner images and asked Ms. Thomas whether she would consent to a strip-search.[21]   The ADC's entry procedures dictated that a strip-search could be required if an officer was unable

---

[12] *Id.* at 20:2–21:12; *see also* Ex. 2 (Termination Docs.) to Defs.' Mot. for Summ. J. (Doc. 37-2) at 29 (Sergeant Haynie's statement).

[13] Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 21:1–4.

[14] *Id.* at 21:6–7.

[15] *Id.* at 21:13–22:4.

[16] Ex. 2 (Termination Docs.) to Defs.' Mot. for Summ. J. (Doc. 37-2) at 25 (Lieutenant Johnson's statement).   Ms. Thomas named "William" Pierce as a Defendant in this action.   Am. Compl. (Doc. 9).   Throughout the record, both "William" and "Robert" are used as Deputy Warden Pierce's first name.   In his deposition, he introduces himself as Robert.   Ex. 3 (Pierce Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-3) at 5:12–14.

[17] Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 22:3–4.

[18] Ex. 2 (Termination Docs.) to Defs.' Mot. for Summ. J. (Doc. 37-2) at 25 (Lieutenant Johnson's statement); Ex. 18 (Plaintiff's Disclosures) to Defs.' Mot. for Summ. J. (Doc. 37-18) at 6 (text message from Ms. Thomas to Captain Johnson).

[19] Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 22:14–15.

[20] *Id.* at 22:14–23:1.

[21] *Id.* at 23:5–8.

to pass the body scanner.[22]   Refusing to consent to a strip-search could have been grounds for discipline, including termination.[23]

It's unclear whether Ms. Thomas had those potential employment consequences in mind when Deputy Warden Pierce asked for her consent.  But Ms. Thomas did verbally consent to the strip-search.[24]   So she, Deputy Warden Pierce, Captain Johnson, Lieutenant Johnson, Sergeant Haynie, and Sergeant Gloria Bell (who had also been in the entry area at the time Ms. Thomas was scanned) proceeded to leave the entry area and walk to a nearby conference room.[25]

The walk to the conference room was short but eventful.  On the way, Ms. Thomas began to undress as she walked ahead of the group.  Ms. Thomas took off her uniform shirt, leaving her in an undershirt.[26]   She then took off her shoes and socks, and tossed her belt onto a chair in the lobby outside of the conference room.[27]   Deputy Warden Pierce told her to "lose [her] attitude" and stay dressed until she was in a private area.[28]   Ms. Thomas responded that she "did not have

---

[22] Ex. 6 (AD 19-25) to Defs.' Mot. for Summ. J. (Doc. 37-6) at 6–7.  Warden Andrea Culclager (the other Defendant in this case) later testified that if a strip-search revealed no contraband, the employee would then undergo an additional post-strip-search scan before being cleared for duty.  Ex. 2 (Culclager Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-2) at 48:19–20.  This post-strip-search scan appears to be a personal innovation by Warden Culclager, as the ADC's written policy states, "If no contraband is found [during a strip-search], the individual will be allowed to dress and proceed."  Ex. 6 (AD 19-25) to Defs.' Mot. for Summ. J. (Doc. 37-6) at 8.

[23] Ex. 6 (AD 19-25) to Defs.' Mot. for Summ. J. (Doc. 37-6) at 8; *see also* Ex. 2 (Culclager Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-2) at 14:20–15:1, 24:4–6.

[24] Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 23:5–10.

[25] *Id.* at 20:22–25, 23:9–24:6.

[26] Ex. 13 (Lobby Video – Part 1) to Defs.' Mot. for Summ. J. (Doc. 37-13) at 5:56:15 [*hereinafter* Lobby Cam Part 1].

[27] *Id.* at 5:56:30–5:56:50.

[28] Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 24:13–25:13.  Deputy Warden Pierce testified that on the way to the conference room, Ms. Thomas was "loud[ly]" and in a "harsh tone" voicing her displeasure with having to be strip-searched.  *See* Ex. 3 (Pierce Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-3) at 22:9–22.  There are similar accounts contained in witness statements from the other ADC officers present at the time.  *See* Ex. 2 (Termination Docs.) to Defs.' Mot. for Summ. J. (Doc. 37-2) at 20–43.  Ms. Thomas testified that she was not talking on the way to the conference room.  *See* Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 24:18–21.  The video footage doesn't show the walk from the entry area to the lobby outside of the conference room.  And the video footage of the lobby is inconclusive as to whether Ms. Thomas was speaking before Deputy Warden Pierce addressed her.  *See* Lobby Cam Part 1 at 5:56:10–5:57:00.  At this stage of the litigation,

4

an attitude."[29]  Ms. Thomas said some other things to Deputy Warden Pierce too.  Specifically, she told him to "shut the fuck up and open that door . . . ."[30]  She put her socks back on, but she left her shoes on the floor and her uniform shirt and belt on the chair.[31]  When Deputy Warden Pierce unlocked the conference room, Ms. Thomas walked in without gathering her things; a fellow officer had to clean up after her.[32]

Deputy Warden Pierce left Ms. Thomas with the other ADC officers and went to an office on the other side of the conference room to call his boss (the other Defendant in this case) Warden Aundrea Culclager.[33]  He told Warden Culclager that Ms. Thomas had been "insolent and insubordinate" and that Ms. Thomas was "in the process of [a] strip search" because of the failed body scans.[34]  Warden Culclager initially ordered a drug test and vehicle search.[35]  She then called Deputy Warden Pierce "right back," said that she was coming to the conference room to speak with Ms. Thomas, and said Deputy Warden Pierce should thus hold off on the drug test and vehicle search.[36]

---

the Court takes Ms. Thomas's version of the facts and proceeds as though Ms. Thomas did not speak until Deputy Warden Pierce told her to lose her attitude.

[29] Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 24:22–23.

[30] Ex. 3 (Pierce Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-3) at 15:15–16.  Ms. Thomas conceded to Warden Culclager that she likely used profanity toward Deputy Warden Pierce.  *See* Ex. 10 (Culclager-Thomas Meeting Tr.) to Defs.' Mot. for Summ. J. (Doc. 37-10) at 8:12–22 (audio on file with the Court); Ex. 2 (Termination Docs.) to Defs.' Mot. for Summ. J. (Doc. 37-2) at 15.

[31] Lobby Cam Part 1 at 5:57:00–5:57:30.

[32] *Id.* at 5:57:45–5:57:55.

[33] Ex. 3 (Pierce Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-3) at 18:11–20.

[34] *Id.* at 18:21–19:1.

[35] *Id.* at 19:2–5.

[36] *Id.*

After Deputy Warden Pierce left to call Warden Culclager, Ms. Thomas went into a bathroom with Sergeants Haynie and Bell (both female) to undergo the strip-search.[37] Ms. Thomas removed her clothes, which were searched by the sergeants.[38] Ms. Thomas removed her tampon and put it in the toilet.[39] She lifted her breasts so the sergeants could see there was nothing hidden underneath.[40] Finally, she squatted and coughed to show that there was nothing hidden in her vaginal or anal cavities.[41] Sergeants Haynie and Bell were satisfied that Ms. Thomas was not smuggling contraband.[42] Ms. Thomas was given a fresh tampon, got dressed, and the three women returned to the conference room.[43]

Ms. Thomas took a seat at the conference table. She immediately began to cry because she felt humiliated after the strip-search.[44] Deputy Warden Pierce asked whether she would consent to a drug test and vehicle search.[45] Ms. Thomas agreed to both.[46] She did not have to urinate at that moment, so she requested permission to get a drink from the vending machine outside the conference room.[47] Deputy Warden Pierce allowed Ms. Thomas to buy a drink; Captain Johnson escorted Ms. Thomas to the vending machine.[48] After getting her drink and returning to the

---

[37] Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 19:13–23, 24:1–4, 27:14–21.

[38] *Id.* at 28:22–29:8.

[39] *Id.* at 28:7–13.

[40] *Id.* at 29:10–14.

[41] *See id.* at 29:10.

[42] *Id.* at 29:23–25.

[43] *Id.* at 29:25–30:2, 30:22–24.

[44] *Id.* at 34:13–22.

[45] *Id.* at 31:6–8. The record is unclear whether refusing to consent to a drug test or vehicle search would carry the same risk of discipline as refusing to consent to a strip search. *See supra* note 23 and accompanying text; *see also* Ex. 19 (AR 401) to Defs.' Mot. for Summ. J. (Doc. 37-19) at 2 (contemplating "[s]earches of all vehicles entering and leaving the facility").

[46] Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 31:6–8.

[47] *Id.* at 31:11–15.

[48] *Id.*

conference room, Ms. Thomas suggested that the ADC officers search her car first and then do the drug test afterward.[49]   Deputy Warden Pierce told Ms. Thomas that the vehicle search and drug test would happen later because Warden Culclager was on her way to speak with Ms. Thomas.[50] At some point during the wait for Warden Culclager, Sergeant Haynie reported to Deputy Warden Pierce that Ms. Thomas had removed a tampon and that the strip-search revealed no contraband.[51]

About ten minutes later, Warden Culclager arrived in the conference room.[52]   Ms. Thomas had never interacted with Warden Culclager before that day.[53]   Warden Culclager's first order of business was to clear the room.[54]   Captain Johnson, Lieutenant Johnson, Sergeant Haynie, and Sergeant Bell filed out.[55]   Only Warden Culclager, Deputy Warden Pierce, and Ms. Thomas remained in the conference room.

As will become clear later in this Order, the next few moments are of outsized importance to the resolution of some of Ms. Thomas's claims.   And because of the nature of Ms. Thomas's claims, Warden Culclager's and Deputy Warden Pierce's knowledge at this point is especially relevant.   So the Court takes a brief detour to further detail what each Defendant knew—and didn't know—when Warden Culclager arrived in the conference room.   Recall that Deputy Warden Pierce was initially told by Lieutenant Johnson that Ms. Thomas had failed the body scanner twice. And while there's no direct evidence of anyone expressly telling Deputy Warden Pierce that a tampon was Ms. Thomas's explanation for the body-scanner results, a rational juror could infer

---

[49] *Id.* at 32:1–3.

[50] *Id.* at 32:8–9.

[51] *See* Ex. 2 (Termination Docs.) to Defs.' Mot. for Summ. J. (Doc. 37-2) at 18.

[52] Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 32:20–22.

[53] *Id.* at 32:23–25.

[54] *Id.* at 33:13–14.

[55] *Id.* at 33:15–17; *see also* Ex. 14 (Lobby Video – Part 2) to Defs.' Mot. for Summ. J. (Doc. 37-14) at 6:28:00–6:28:20 [*hereinafter* Lobby Cam Part 2].

that the tampon explanation was relayed to Deputy Warden Pierce—either by Lieutenant Johnson when she called Deputy Warden Pierce to report the failed scans, or by Lieutenant Johnson, Captain Johnson, or Ms. Thomas herself when Deputy Warden Pierce arrived at the entry area. But it was not until after the strip-search was conducted (which was after Deputy Warden Pierce called Warden Culclager but before Warden Culclager entered the conference room) that Deputy Warden Pierce learned that Ms. Thomas had indeed been wearing a tampon and that no contraband had been discovered during the strip-search.

To be clear, at the time Warden Culclager appeared on the scene, Deputy Warden Pierce knew that Ms. Thomas had failed two body scans, that Ms. Thomas had been rude and disrespectful on the way to the conference room, and that the strip-search had confirmed Ms. Thomas's tampon explanation and cleared her of contraband. But Warden Culclager's knowledge was more limited. Her knowledge of the situation came entirely from Deputy Warden Pierce's pre-strip-search phone call. Thus, Warden Culclager at most knew that Ms. Thomas had failed two body scans (which Ms. Thomas blamed on a tampon) and that Deputy Warden Pierce considered Ms. Thomas to have been insolent and insubordinate.[56] She did not know that a strip-search had cleared Ms. Thomas of contraband.

Armed with this understanding of each Defendant's knowledge or lack thereof, we can continue the story. Warden Culclager began speaking to Ms. Thomas, who was still crying at this point.[57] Warden Culclager mentioned the report from Deputy Warden Pierce that Ms. Thomas

---

[56] Just as there is no direct evidence of anyone informing Deputy Warden Pierce (before the strip-search) that Ms. Thomas claimed to be wearing a tampon, there is also no direct evidence of Deputy Warden Pierce relaying that information to Warden Culclager on the pre-strip-search phone call. But, just as a rational juror could make the inference that Deputy Warden Pierce had been informed of the tampon explanation prior to calling Warden Culclager, a rational juror could infer that Deputy Warden Pierce included that piece of information in his update to Warden Culclager.

[57] Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 35:7–17.

was being uncooperative.[58]  Ms. Thomas countered that she had "agreed to a strip search, . . . agreed to a drug test, and . . . agreed to let them search [her] car . . . ."[59]  Warden Culclager asked some other questions; Ms. Thomas did not respond.  Ms. Thomas testified that, due to her crying, she was not focusing on Warden Culclager's questions and was having trouble getting her answers out.[60]  Warden Culclager thought Ms. Thomas was ignoring her questions.[61]

Warden Culclager threatened to call the Arkansas State Police if Ms. Thomas didn't start answering her questions.[62]  Ms. Thomas asked why calling the police would be necessary.  Warden Culclager said that the police would "get whatever is in [Ms. Thomas] out."[63]  Ms. Thomas "told her that there is nothing in [Ms. Thomas]," that the scanner had shown a tampon, and that Sergeants Haynie and Bell had "already strip-searched . . . and cleared" Ms. Thomas.[64]  It is unclear from the record if Warden Culclager (1) actually heard this last statement and refused to believe Ms. Thomas, or (2) simply didn't hear Ms. Thomas's statement at all (perhaps because, as Ms. Thomas noted, she was having trouble speaking clearly due to her crying).[65]  A rational juror could certainly infer that Warden Culclager heard the statement made by Ms. Thomas.  And this is the most pro-

---

[58] *Id.* at 33:19–21.

[59] *Id.* at 33:23–34:1.

[60] *Id.* at 35:22–36:1.

[61] *Id.*; *see* Ex. 2 (Culclager Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-2) at 38:9–39:21.

[62] Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 36:1–3.

[63] *Id.* at 36:3–4.

[64] *Id.* at 36:4–6.

[65] Several minutes after this statement from Ms. Thomas, Warden Culclager ordered that a strip-search be conducted.  *See infra* notes 91–92 and accompanying text.  Warden Culclager's subsequent strip-search order could lead a rational juror to reach one of two equally reasonable conclusions: (1) Warden Culclager never actually heard Ms. Thomas's earlier statement about having been strip-searched already, or (2) Warden Culclager refused to believe Ms. Thomas's earlier statement and intended to proceed with a strip-search until someone more reliable confirmed Ms. Thomas's statement that she had already been strip-searched.  Ms. Thomas reads the record a third way—as showing that Warden Culclager maliciously ordered an additional strip-search (knowing one had previously occurred) as a form of retaliation for Ms. Thomas's alleged insolence and insubordination.  *See* Feb. 21, 2023 Hr'g Tr. (Rough) at 4–5, 46.  The Court concludes below, however, that no rational juror could find that Warden Culclager's strip-search order was retaliatory.  *See infra* notes 147, 180.

plaintiff version of the record a rational juror could reach.  So, for purposes of summary judgment, the Court assumes that Warden Culclager heard (but did not believe) Ms. Thomas's statement that she had already passed a strip-search.

Anywhere from a few seconds to a full minute of silence elapsed after Ms. Thomas told Warden Culclager that Ms. Thomas had already passed a strip-search.[66]  Ms. Thomas then "proceeded to get up to walk out of the conference room."[67]  She testified that she tried to leave the room because "[Warden Culclager] wasn't listening to [her], and so [she] didn't know what else to say."[68]  Warden Culclager hadn't confirmed whether a strip-search had indeed already cleared Ms. Thomas—despite the fact that Deputy Warden Pierce was in the room and it would have taken only a few seconds to ask him if Ms. Thomas was telling the truth.  And Warden Culclager considered it suspicious that someone being questioned about contraband smuggling would try to leave shortly after a threat to call the police.[69]  So, as Ms. Thomas opened the door to leave the conference room, Warden Culclager ordered Deputy Warden Pierce to close the door.[70]  He did so.[71]  However, Ms. Thomas—in her own words—"powered [her] way" past Deputy Warden Pierce (which must have included opening the door while Deputy Warden Pierce was holding it shut) and walked out of the conference room into the lobby.[72]

---

[66] *Compare* Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 36:1–37:14 (indicating that Ms. Thomas's statement was the end of the conversation), *with* Ex. 2 (Termination Docs.) to Defs.' Mot. for Summ. J. (Doc. 37-2) at 8 (Ms. Thomas saying that she "sat for a minute" after telling Warden Culclager that a strip-search had already cleared Ms. Thomas).

[67] Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 37:4–8.

[68] *Id.* at 37:9–14.

[69] *See* Ex. 10 (Culclager-Thomas Meeting Tr.) to Defs.' Mot. for Summ. J. (Doc. 37-10) at 17:14–22 (audio on file with the Court); Ex. 2 (Termination Docs.) to Defs.' Mot. for Summ. J. (Doc. 37-2) at 16.

[70] Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 37:20–24.

[71] *Id.*

[72] Ex. 2 (Termination Docs.) to Defs.' Mot. for Summ. J. (Doc. 37-2) at 1; *see also* Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 38:10–13.

Captain Johnson, Lieutenant Johnson, Sergeant Haynie, and Sergeant Bell were still in the lobby at this time.[73]   Warden Culclager ordered those officers to handcuff Ms. Thomas.[74]   The officers' attempts to restrain Ms. Thomas did not go smoothly. Captain Johnson grabbed Ms. Thomas's left arm as she came out of the conference room.[75]   Ms. Thomas jerked her arm out of Captain Johnson's grasp, spun around, and backpedaled away from the group of officers.[76]   She walked down an adjoining hallway, and the group of officers followed.[77]   The officers were joined by Deputy Warden Pierce as well as Lieutenant Quinn Mixon, who had come to the lobby as Ms. Thomas exited the conference room.[78]   Lieutenant Mixon was able to calm Ms. Thomas.[79]   Captain Johnson took Ms. Thomas's right arm and led her back into the conference room.[80]   Although Ms. Thomas was not placed in handcuffs, she did not go back into the conference room willingly.[81]   Ms. Thomas and Captain Johnson were followed by all of the aforementioned ADC officers except for Lieutenant Mixon, who had walked away after calming Ms. Thomas.[82]

---

[73] Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 38:14–21.

[74] *Id.*

[75] Lobby Cam Part 2 at 6:29:45–6:29:50.  Ms. Thomas and Captain Johnson were closely acquainted prior to the events of that day.  *See* Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 53:5–55:14 (Ms. Thomas acknowledging that she and Captain Johnson had been romantically involved during her term of employment with the ADC).

[76] Lobby Cam Part 2 at 6:29:50.

[77] *Id.*  at 6:29:50–6:30:00.

[78] *Id.*; *see* Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 41:3–14, 78:1–4 (Ms. Thomas identifying Lieutenant Mixon in the video).

[79] *See* Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 41:13–42:5.

[80] Lobby Cam Part 2 at 6:30:55–6:31:05.

[81] *Id.*; Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 39:8–10.

[82] Lobby Cam Part 2 at 6:31:00–6:31:25; Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 41:18–22.

While in the conference room, Lieutenant Johnson tried to place handcuffs on Ms. Thomas.[83]  Ms. Thomas warned the officers that "if the cuffs touched" her, then she "was going to swing."[84]  Ms. Thomas and the group of officers "somehow" ended up back in the lobby about one minute later.[85]  By this time, Captain Johnson had Ms. Thomas in a bear-hug from behind, such that both of Ms. Thomas's arms were pinned down by her side.[86]  Lieutenant Johnson continued trying to place handcuffs on Ms. Thomas, but Ms. Thomas would move her hands (the little bit that she could) each time to avoid being handcuffed.[87]  This back-and-forth lasted about forty-five seconds.[88]  Eventually, Captain Johnson forced Ms. Thomas back into the conference room.[89]  At no point was Ms. Thomas placed in handcuffs.[90]

Ms. Thomas was now back in the conference room for a third time—this time with Warden Culclager, Deputy Warden Pierce, and Captain Johnson.[91]  Warden Culclager said that Ms. Thomas needed to be strip-searched.[92]  Ms. Thomas told Warden Culclager that she had already

---

[83] Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 39:8–12.

[84] *Id.* at 39:18–19.

[85] Lobby Cam Part 2 at 6:31:50–6:32:00; Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 41:3.

[86] Lobby Cam Part 2 at 6:31:50–6:32:00.

[87] *Id.* at 6:32:00–6:32:40.

[88] *Id.*

[89] *Id.*

[90] Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 39:4–5.  The Court relies mostly on the security camera footage to recount the ADC officers' attempts to restrain Ms. Thomas in the lobby.  Ms. Thomas's deposition testimony in large part comports with that video footage.  There are, however, some inconsistencies.  When such inconsistencies occur, the Court relies on the video over the testimony.  *See Scott v. Harris*, 550 U.S. 372, 379–81 (2007).  These inconsistencies relate almost entirely to the exact sequence of the events that transpired; Ms. Thomas's testimony is slightly out of order.  For example, she says Captain Johnson bear-hugged her during the initial lobby encounter between her and the other officers.  *See* Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 38:22–42:13.  But the video clearly shows the bear-hug happened *after* Ms. Thomas and the officers returned to the lobby for the second time.  *See supra* notes 85–88 and accompanying text.  The differences between Ms. Thomas's testimony and the video are not meaningful (let alone dispositive).

[91] Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 42:23–43:1.

[92] *Id.* at 43:4–5.

been strip-searched and that she had "been trying to tell" Warden Culclager as much.[93]  Warden Culclager asked Ms. Thomas whether she had been back on the body scanner since the strip-search; Ms. Thomas said that she had not.[94]  Warden Culclager confirmed all of this information with Captain Johnson, who then escorted Ms. Thomas down to the entry area for another body scan.[95]  Ms. Thomas passed the post-strip-search scan.[96]

After passing the body scan, Ms. Thomas asked Captain Johnson if she could go home.[97]  Captain Johnson took this as an indication that Ms. Thomas was quitting her job, but Ms. Thomas clarified that she was not quitting.[98]  She was simply "not able or in the mental state to proceed to go to work."[99]  Captain Johnson told Ms. Thomas that Warden Culclager wanted to speak with her, so Captain Johnson escorted Ms. Thomas to Warden Culclager's office.[100]

Ms. Thomas and Warden Culclager had a one-on-one, closed-door conversation in Warden Culclager's office.[101]  Warden Culclager sent Ms. Thomas home for being "disrespectful" to Warden Culclager and Deputy Warden Pierce.[102]  Ms. Thomas retorted that "respect is a two-way thing . . . ."[103]  Warden Culclager disagreed and said that neither she nor Deputy Warden Pierce "have to respect" Ms. Thomas because "they're [Ms. Thomas's] boss[es]."[104]  Ms. Thomas

---

[93] *Id.* at 43:7–8.

[94] *Id.* at 43:9–10.

[95] *See id.* at 43:11–17.

[96] *See* Ex. 2 (Culclager Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-2) at 48:16–22.

[97] Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 43:18.

[98] *Id.* at 43:18–21.

[99] *Id.* at 43:20–21.

[100] *Id.* at 43:22–44:4.

[101] *Id.* at 44:5–23.

[102] *Id.* at 44:5–8.

[103] *Id.* at 44:9.

[104] *Id.* at 44:9–11.

explained that she felt like Warden Culclager had overstepped by ordering that Ms. Thomas be restrained.[105]  Warden Culclager responded that "she [didn't] know what they did prior to her, but [those were] her rules."[106]  Warden Culclager told Ms. Thomas "to go home and not to return until [Warden Culclager] or HR called" Ms. Thomas.[107]  Ms. Thomas walked unescorted from Warden Culclager's office to the parking lot and drove home.[108]

The next day, October 26, 2020, Ms. Thomas received a phone call scheduling a meeting with Warden Culclager.[109]  That meeting was set for two days later, October 28, 2020.[110]  In between this phone call and the meeting, Ms. Thomas tried to file a formal grievance.[111]  She was told that was not an option at that time because, thus far, no official disciplinary action had been taken against her.[112]  Instead, Ms. Thomas sent an email describing the events of October 25, 2020, to Grievance Officer Tammy Baker.[113]

Ms. Thomas and Warden Culclager met on October 28, 2020, in Warden Culclager's office.[114]  Also present was an HR representative, Tabitha Whaley.[115]  Warden Culclager read Ms. Thomas a statement written by Deputy Warden Pierce recommending Ms. Thomas's termination.[116]  Warden Culclager expressed her agreement with Deputy Warden Pierce's

---

[105] *See id.* at 44:11–14.

[106] *Id.* at 44:15–16.

[107] *Id.* at 45:1–2.

[108] *Id.* at 45:10–46:11.

[109] *Id.* at 49:2–5.

[110] *Id.*

[111] *See id.* at 50:16–18.

[112] *Id.* at 50:19–51:16.

[113] *See id.*; Ex. 2 (Termination Docs.) to Defs.' Mot. for Summ. J. (Doc. 37-2) at 8–9.

[114] Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 49:6–9.

[115] *Id.* at 49:10–11.

[116] *Id.* at 49:19–24; *see* Ex. 2 (Termination Docs.) to Defs.' Mot. for Summ. J. (Doc. 37-2) at 18–19.

recommendation and told Ms. Thomas that she was being terminated for insubordination.[117] According to Warden Culclager, the insubordinate acts for which Ms. Thomas was terminated included her behavior on the walk to the conference room, her statements to Deputy Warden Pierce as he was unlocking the conference room door, and (what Warden Culclager perceived to be) Ms. Thomas's refusal to answer Warden Culclager's questions in the conference room.[118] Additionally, Warden Culclager considered Ms. Thomas to have created a safety risk in the prison by (1) exhibiting "assaultive behavior" when she powered past Deputy Warden Pierce out of the conference room and (2) physically resisting the other officers' attempts to restrain her.[119]  Ms. Thomas filed a formal grievance challenging her termination on November 2, 2020.[120]  That grievance was denied on November 5, 2020.[121]  Ms. Thomas filed the case at bar on December 23, 2020.[122]

After her termination from the ADC, Ms. Thomas worked a variety of jobs.[123]  In February of 2022, Ms. Thomas became employed as a patient care technician by Wellpath.[124]  Ms. Thomas was assigned to the infirmary at the ADC's Tucker Max unit.[125]  Ms. Thomas worked for Wellpath for "[t]hree weeks until [she] got escorted off the premises" of Tucker Max.[126]  Ms. Thomas

---

[117] Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 49:22–50:2.

[118] *See* Ex. 2 (Culclager Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-2) at 7:21–9:11, 21:13–22:2, 28:20–29:14, 33:7–11, 38:9–39:21, 72:13–73:6; *see also* Ex. 2 (Termination Docs.) to Defs.' Mot. for Summ. J. (Doc. 37-2) at 13–17.

[119] Ex. 2 (Culclager Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-2) at 49:1–3, 62:23–63:3, 65:22–66:4, 67:3–9; *see also* Ex. 2 (Termination Docs.) to Defs.' Mot. for Summ. J. (Doc. 37-2) at 13–17.

[120] Ex. 2 (Termination Docs.) to Defs.' Mot. for Summ. J. (Doc. 37-2) at 1–7.

[121] *Id.* at 9.

[122] Compl. (Doc. 1).

[123] Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 87:22–90:22.

[124] *Id.* at 90:22–91:2.

[125] *Id.* at 90:23–24.

[126] *Id.* at 91:3–4.

testified that she was escorted off the premises by the Warden of Tucker Max—who just so happened to be the brother-in-law of Defendant Warden Culclager.[127]

Somebody—it is unclear who—made a call to Tucker Max and said that Ms. Thomas "could not be there."[128]  According to Ms. Thomas, the unidentified caller was referring to "an ADC policy that bars former employees who have filed suit against the ADC from working on ADC property."[129]  Both the Tucker Max Warden and a Wellpath "administrator" received such a call.[130]  And both told Ms. Thomas "that it had to have something probably to do with what happened" back in October of 2020.[131]  Ms. Thomas testified that, after she had been escorted from the premises, ADC Lieutenant Cantrell Bass relayed to Ms. Thomas that Lieutenant Bass had been "told it was because of [this] lawsuit."[132]  Ms. Thomas has not spoken to anyone other than Lieutenant Bass about the reasons for her being fired from Wellpath.[133]  On May 17, 2022, Ms. Thomas filed a Supplemental Complaint in the case at bar, which included claims related to this Tucker Max incident.[134]

## DISCUSSION

Ms. Thomas brings numerous federal claims.  Specifically, she says that Warden Culclager and Deputy Warden Pierce violated the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.[135]  The First, Fourth, and Fifth Amendment rights asserted by Ms.

---

[127] *Id.* at 93:3–12.

[128] *Id.* at 94:4–12.

[129] Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49) ¶ 12.

[130] Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 94:4–15.

[131] *Id.* at 94:9–12.

[132] *Id.* at 94:18–25.

[133] *Id.* at 95:7–9.

[134] Suppl. Compl. (Doc. 31).

[135] Am. Compl. (Doc. 9) ¶¶ 18–26.

Thomas are applicable to the states via the doctrine of incorporation.[136]  And 42 U.S.C. § 1983 authorizes a United States citizen to sue state actors who deprived that citizen of his or her constitutional rights.[137]  Ms. Thomas also claims that Defendants violated various provisions of the Arkansas Constitution and committed the state common law torts of battery, false imprisonment, and invasion of privacy.[138]

Defendants say that they are entitled to summary judgment on Ms. Thomas's federal and state constitutional claims.[139]  As for Ms. Thomas's state common law claims, Defendants primarily contend that the Court should decline to exercise supplemental jurisdiction and let Ms. Thomas pursue those claims in state court.[140]  In the alternative, Defendants argue for summary judgment on such claims.

## I.     Federal Constitutional Claims

Defendants argue that the doctrine of qualified immunity entitles them to summary judgment on all of Ms. Thomas's federal constitutional claims.  This Court has recently expounded upon its approach to the qualified-immunity analysis:

> Two questions are raised when a government official invokes the defense of qualified immunity at the summary-judgment stage.  One question is simply the normal summary-judgment analysis, i.e., whether a rational juror could conclude that the government official violated the applicable law.  The other question—unique to the qualified-immunity context—asks whether the applicable law was so "clearly established" that the government official is either a complete nincompoop or must have known that his or her conduct violated that law.  If the answer to either question is "no," then qualified immunity is appropriate.  A court may answer these questions in whichever order it chooses.  And, although Supreme Court and Eighth Circuit precedent don't require it, my inclination is to begin with the

---

[136] *See Dickerson v. United States*, 530 U.S. 428, 434 (2000); *Terry v. Ohio*, 392 U.S. 1, 8 (1968); *Animal Legal Def. Fund v. Reynolds*, 8 F.4th 781, 784 (8th Cir. 2021).

[137] *See Nieves v. Bartlett*, 139 S. Ct. 1715, 1721 (2019).

[138] Am. Compl. (Doc. 9) ¶¶ 27–32.

[139] Defs.' Mot. for Summ. J. (Doc. 37) ¶¶ 2–7.

[140] *See id.* ¶¶ 3, 8.

straightforward question about the existence of a [constitutional] violation.  This avoids a vicious cycle where it never becomes "clearly established" whether certain conduct violates the law.[141]

The Court will hew to that framework in the case at bar.

### A.    Fourth Amendment Claims

The Fourth Amendment declares:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.[142]

Analysis of a Fourth Amendment claim comprises two steps: (1) determine whether a search or seizure occurred; and (2) determine whether that search or seizure was reasonable.[143]  Defendants' invocation of the qualified-immunity defense adds a layer to each step.  Not only must the Court determine whether a search or seizure occurred; the Court must also analyze whether it was "clearly established" in October of 2020 that the relevant conduct amounted to a search or seizure.[144]  And even if the Court concludes that a clearly established search or seizure was unreasonable under the Fourth Amendment, Defendants are entitled to immunity so long as it was at least "arguabl[y]" reasonable for a Defendant to think the search or seizure was lawful.[145]

Ms. Thomas contends that Defendants committed two obvious violations of her clearly established Fourth Amendment rights.  First, she argues that the strip-search was unconstitutional

---

[141] *Sterling v. Bd. of Trs. of Univ. of Ark.*, 4:19-CV-00025-LPR, 2022 WL 17252422, at *5 (E.D. Ark. Nov. 28, 2022) (footnotes and citations omitted).

[142] U.S. Const. amend. IV.

[143] *Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602, 617–19 (1989).

[144] *Quraishi v. St. Charles Cnty.*, 986 F.3d 831, 840 (8th Cir. 2021).

[145] *De La Rosa v. White*, 852 F.3d 740, 745–46 (8th Cir. 2017) (citing *New v. Denver*, 787 F.3d 895, 899 (8th Cir. 2015)).

because there was not a search warrant.[146]  Second, she claims that Warden Culclager's order to have Ms. Thomas physically detained and handcuffed after she left the conference room caused an unlawful seizure.[147]

### 1.      Strip-Search

Nobody disputes that in October of 2020 it was clearly established that a strip-search was a search within the meaning of the Fourth Amendment.[148]  But the Court has little trouble concluding that the strip-search did not violate the Fourth Amendment.

It is well established in the Eighth Circuit that a prison official can require anyone—visitors or fellow employees—entering a prison to submit to a strip-search if there is "reasonable suspicion" that the person being searched is attempting to smuggle contraband into the prison.[149] And Ms. Thomas concedes that the body-scanner results gave rise to reasonable suspicion.[150]  Even if she didn't concede that point, the Court would conclude on its own that the body-scanner results created the reasonable suspicion necessary to order a strip-search.  At the very least, it provided Deputy Warden Pierce with arguable reasonable suspicion.[151]  Accordingly, summary judgment is

---

[146] Br. in Supp. of Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 51) at 4–5.

[147] *Id.*  At oral argument, Ms. Thomas articulated a third theory: Fourth Amendment retaliation.  She claims that Warden Culclager fired Ms. Thomas (at least in part) because Ms. Thomas did not immediately agree to a second strip-search after Ms. Thomas had been physically detained and forced back into the conference room.  *See* Feb. 21, 2023 Hr'g Tr. (Rough) at 4–5, 46.  There's no support for that claim in the record.  Warden Culclager abandoned the second strip-search immediately after Captain Johnson confirmed that Ms. Thomas had already been cleared by an earlier strip-search.  *See supra* notes 91–95 and accompanying text.  So there's no reason to think the post-detention strip-search was particularly important to Warden Culclager—which would explain the complete lack of evidence (direct or circumstantial) that would allow a rational juror to conclude that Ms. Thomas's resistance to the second strip-search in any way factored into Warden Culclager's termination decision.

[148] *See, e.g.*, *McDonell v. Hunter*, 809 F.2d 1302, 1306–07 (8th Cir. 1987).

[149] *Ford v. Dowd*, 931 F.2d 1286, 1292 (8th Cir. 1991); *McDonell*, 809 F.2d at 1306–07; *Hunter v. Auger*, 672 F.2d 668, 674–75 (8th Cir. 1982).

[150] *See* Br. in Supp. of Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 51) at 5; Feb. 21, 2023 Hr'g Tr. (Rough) at 2 (Ms. Thomas conceding that "the initial strip search" claim is "probably the weakest").

[151] *See De La Rosa*, 852 F.3d at 745–46.

appropriate in favor of Deputy Warden Pierce on the strip-search claim.[152]  The strip-search did not violate Ms. Thomas's clearly established Fourth Amendment rights.[153]

### 2.     Detention

A seizure "can take the form of 'physical force' or a 'show of authority' that 'in some way restrain[s] the liberty' of the person."[154]  A physical-force seizure occurs when a government actor uses, against a person, "force with intent to restrain."[155]  With respect to the government actor's intent, "the appropriate inquiry is whether the challenged conduct objectively manifests an intent to restrain, for [courts] rarely probe the subjective motivations of [government officials] in the Fourth Amendment context."[156]  A "mere touch can be enough for a seizure," even if the

---

[152] Ms. Thomas has not made clear exactly who she is suing on the strip-search claim—Deputy Warden Pierce, Warden Culclager, or both.  This claim can be brought only against Deputy Warden Pierce, however, because he is the one who ordered the strip-search.  There is no evidence that Warden Culclager had anything to do with the decision to strip-search Ms. Thomas.  To the extent that Ms. Thomas is trying to challenge the ADC's policy requiring strip-searches, such a claim is not properly brought in this case.  Ms. Thomas's Fourth Amendment claims are brought against Defendants solely in their individual capacities.  *See* Am. Compl. (Doc. 9) at 1.  To challenge the underlying entry-procedures policy, Ms. Thomas would have needed to bring suit against Defendants in their official capacities.  *See Nix v. Norman*, 879 F.2d 429, 432–33 (8th Cir. 1989).  And even if she had done so, the claim would still fail.  Such a claim could have been brought only for prospective injunctive relief, *see id.*, but Ms. Thomas would not have Article III standing to seek injunctive relief because there is no evidence that she will be subjected to the ADC's entry-procedures policy in the future.  *See Miller v. City of St. Paul*, 823 F.3d 503, 507–08 (8th Cir. 2016).

[153] The debate about whether Ms. Thomas voluntarily consented to the strip-search (or instead whether her consent was coerced by the fear of discipline for non-consent) is beside the point.  Because there was reasonable suspicion, the search was constitutional even without consent.  This conclusion—that the strip-search was constitutional even in the absence of consent or a search warrant—nullifies Ms. Thomas's backup argument that the strip-search violated the Fourth Amendment via the unconstitutional conditions doctrine.  *See* Br. in Supp. of Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 51) at 5.  Under that doctrine, a government employer cannot force an employee to give up a constitutional right in order to remain employed.  *See e.g.*, *True v. Nebraska*, 612 F.3d 676, 679 (8th Cir. 2010) ("If a search is unreasonable, a government employer cannot require that its employees consent to that search as a condition of employment." (citation omitted)).  Given that the strip-search wasn't unconstitutional in the first place, Ms. Thomas's employment wasn't conditioned on her waiving any Fourth Amendment right.

[154] *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021) (alteration in original) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)).

[155] *Id.* at 998 (emphasis omitted).

[156] *Id.* (emphasis omitted).

government actor is ultimately unsuccessful in restraining the person to be seized.[157]   The person

is considered to have been "seized" for however long there was physical contact.[158]

A physical-force seizure occurred in the case at bar when, upon the order of Warden

Culclager, the officers standing in the lobby outside of the conference room laid hands on Ms.

Thomas.[159]   There can be no dispute that Warden Culclager's order, and the other officers'

compliance with that order, objectively manifested an intent to restrain Ms. Thomas.   There is

likewise no disputing that the officers physically touched Ms. Thomas.   And even though it isn't

required to commit a physical-force seizure, the officers were successful in restraining Ms.

Thomas's liberty of movement.   It was clearly established law in October of 2020 that such conduct

was a seizure under the Fourth Amendment.[160]

The parties agree that the reasonableness of that clearly established seizure depends upon

whether Warden Culclager had a "reasonable suspicion" that Ms. Thomas was smuggling

---

[157] *Id.* at 998–99.

[158] *Id.* at 999.

[159] The seizure claim is properly brought against only Warden Culclager.  Deputy Warden Pierce neither ordered the lobby seizure nor laid hands on Ms. Thomas.  And there was no other seizure before this.  Ms. Thomas was not "seized" within the meaning of the Fourth Amendment during the strip-search because a reasonable person in her shoes would not have complied with the strip-search order out of fear of arrest but instead to avoid employment-related discipline.  *See Gwynn v. City of Philadelphia*, 719 F.3d 295, 299–302 (3d Cir. 2013); *Pennington v. Metro. Gov't of Nashville & Davidson Cnty.*, 511 F.3d 647, 652 (6th Cir. 2008); *Aguilera v. Baca*, 510 F.3d 1161, 1167–69 (9th Cir. 2007); *Driebel v. City of Milwaukee*, 298 F.3d 622, 640–42 (7th Cir. 2002).  And there was no seizure when Deputy Warden Pierce tried to close the conference room door because (1) Ms. Thomas did not submit to Deputy Warden Pierce's or Warden Culclager's exercises of authority and (2) there had not yet been an application of physical force by a government actor against the person of Ms. Thomas.  *See Torres*, 141 S. Ct. at 995.

At oral argument, Ms. Thomas argued that the few seconds of Ms. Thomas struggling to open the door while Deputy Warden Pierce held it closed constituted a physical-force seizure even if Deputy Warden Pierce never actually touched Ms. Thomas.  *See* Feb. 21, 2023 Hr'g Tr. (Rough) at 39–40.  The Court disagrees.  This is not a situation where the door was some object, such as a gun or a nightstick, used by Deputy Warden Pierce to apply force to the person of Ms. Thomas.  Instead, Deputy Warden Pierce was simply applying force to the door while Ms. Thomas was doing the same.  That's more a show of authority than use of physical force against a person.  But, as noted, Ms. Thomas didn't submit to the show of authority.  Without such submission, a show of authority does not amount to an actionable seizure.  *See Brendlin v. California*, 551 U.S. 249, 254 (2007).

[160] *See, e.g.*, *California v. Hodari D.*, 499 U.S. 621 (1991).

contraband into the prison.[161]  The existence of reasonable suspicion depends upon the facts known

to Warden Culclager at the time she ordered the seizure.[162]  Even on the most pro-plaintiff version

of the record, Warden Culclager had personal knowledge of the following:

(1) Ms. Thomas had failed the body scanner twice;

(2) Ms. Thomas said the failed scans were due to a tampon;

(3) Deputy Warden Pierce believed that Ms. Thomas had been insolent and used profane language against Deputy Warden Pierce and other officers in response to being asked to submit to a strip-search;

(4) Ms. Thomas was crying and having trouble speaking, which could reasonably be taken as a sign that Ms. Thomas was nervous or upset because she knew she had been caught doing something illegal;

(5) Ms. Thomas had (in Warden Culclager's view) refused to answer Warden Culclager's questions in the conference room;

(6) Ms. Thomas tried to leave the conference room shortly after Warden Culclager mentioned the possible involvement of the Arkansas State Police;

---

[161] *See* Feb. 21, 2023 Hr'g Tr. (Rough) at 38–39.  It's an interesting question whether Warden Culclager's order to seize Ms. Thomas should be analyzed under a probable-cause standard or, alternatively, under a reasonable-suspicion standard.  Defendants could have argued that Warden Culclager, by investigating potential employee-conduct-policy violations and ensuring the safety of the prison, was acting solely as an employer.  That argument would likely entitle Defendants' conduct to relaxed Fourth Amendment scrutiny (and thus the reasonable-suspicion standard).  *See, e.g.*, *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 671 (1989).  But Warden Culclager waived that potential argument.  Warden Culclager says (1) she was *not* concerned about Ms. Thomas being a safety risk, and (2) she was entitled to order the seizure of Ms. Thomas because she was investigating the *crime* of smuggling contraband into a prison.  *See* Feb. 21, 2023 Hr'g Tr. (Rough) at 21–25.  Given Warden Culclager's explicit concessions, she has to play by the same Fourth Amendment rules as any other law enforcement officer investigating a crime.  *Cf. Von Raab*, 489 U.S. at 679 (applying relaxed scrutiny because the government program at issue was "not designed to serve the ordinary needs of law enforcement"); *Rushton v. Neb. Pub. Power Dist.*, 844 F.2d 562, 566–67 (8th Cir. 1988) (noting that "investigation[s] . . . designed to enforce criminal laws [or] likely to be used to bring criminal charges" create a greater "need for protection against governmental intrusions").  In the criminal-investigation context, Warden Culclager's seizure order would have required probable cause if it was made with a purpose to facilitate a custodial interrogation, but it would likely have required only reasonable suspicion if the seizure was for the more limited purpose of briefly questioning Ms. Thomas in order to confirm or dispel Warden Culclager's suspicion that Ms. Thomas was smuggling contraband.  *See Davis v. Dawson*, 33 F.4th 993, 998–99 (8th Cir. 2022).  It's far from obvious into which of these two buckets Warden Culclager's seizure order would fall.  In any event, this debate is purely academic.  First, Ms. Thomas made a concession of her own—that the detention required only reasonable suspicion.  *See* Feb. 21, 2023 Hr'g Tr. (Rough) at 38–39.  Second, the Court finds that, even when Warden Culclager's conduct is analyzed under the extremely forgiving arguable-reasonable-suspicion standard, Warden Culclager violated Ms. Thomas's clearly established Fourth Amendment rights.  *See infra* pp. 23–27.

[162] *See Watson v. Boyd*, 2 F.4th 1106, 1111 (8th Cir. 2021).

(7) Ms. Thomas aggressively and forcefully powered her way past Deputy Warden Pierce and rushed out of the conference room; and

(8) Ms. Thomas had not yet passed the body scanner.

And on those facts, Warden Culclager could have reasonably suspected that Ms. Thomas was smuggling contraband into the prison.[163]

But Warden Culclager may have known one additional piece of information: Ms. Thomas had already undergone a strip-search, which both confirmed Ms. Thomas's tampon explanation and cleared Ms. Thomas of contraband. Recall that, just before she got up from the table to leave the conference room, Ms. Thomas told Warden Culclager that Sergeants Haynie and Bell had "already strip-searched . . . and cleared" Ms. Thomas.[164] That's not just some minor, marginally relevant piece of information. In the vernacular, that's "huge." If Warden Culclager had knowledge of Ms. Thomas passing a strip-search, it would make any lingering suspicion unreasonable.[165]

---

[163] Defendants have waived any argument that Warden Culclager's seizure order was based on a concern that Ms. Thomas presented some kind of safety risk. *See* Feb. 21, 2023 Hr'g Tr. (Rough) at 21–25. The Court therefore assesses only the reasonableness of Warden Culclager's suspicion that Ms. Thomas was smuggling contraband. But even if safety concerns were an asserted basis for the seizure, the Court's conclusion would remain the same. To be sure, Ms. Thomas's behavior—powering her way past Deputy Warden Pierce—was unprofessional. And the Fourth Amendment would not have been implicated had Warden Culclager simply ordered Ms. Thomas to leave the prison, suspended her, or even fired her on the spot. But physically seizing Ms. Thomas and forcing her back into the conference room (as opposed to escorting her out of the prison) was an unreasonably severe step, even if premised on safety concerns.

[164] Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 36:4–6.

[165] During oral argument, Defendants argued that Warden Culclager's suspicion was reasonable because Ms. Thomas had not yet undergone "[Warden] Culclager's process" of a post-strip-search body scan. *See* Feb. 21, 2023 Hr'g Tr. (Rough) at 15; *see also supra* note 22. Conversely, Ms. Thomas argued that ADC policy actually negated reasonable suspicion. *See* Ex. 6 (AD 19-25) to Defs.' Mot. for Summ. J. (Doc. 37-6) at 8 ("If no contraband is found [during a strip-search], the individual will be allowed to dress and proceed."). These arguments are red herrings. Neither state law, nor a state agency regulation, nor a state agency administrator's unwritten policy preference dictates what is and is not reasonable suspicion under the Fourth Amendment. *See Virginia v. Moore*, 553 U.S. 164, 176 (2008) ("[S]tate restrictions do not alter the Fourth Amendment's protections."); *Rose v. City of Mulberry*, 533 F.3d 678, 680 (8th Cir. 2008) ("[The officer] lacked the authority under Arkansas law to make traffic stops and arrests on the Interstate. Nevertheless, because he had probable cause to arrest . . . no Fourth Amendment violation occurred . . . .").

Defendants also tried to justify the reasonableness of Warden Culclager's "process" under the facts of this particular case by arguing that (1) the initial body scans showed something that looked different than a tampon, but (2) the strip-search revealed only a tampon, so (3) Warden Culclager was still reasonably suspicious that Ms. Thomas was

It is a genuinely disputed question of historical fact as to whether Warden Culclager actually heard Ms. Thomas's statement.[166]  Because Ms. Thomas gets the benefit of any such disputes at this stage of the litigation, the Court proceeds as though Warden Culclager did indeed hear—and chose to ignore—Ms. Thomas's statement that she had already passed a strip-search. With that information known to her, Warden Culclager violated Ms. Thomas's clearly established Fourth Amendment rights by unreasonably causing Ms. Thomas to be seized.

Warden Culclager was not free to ignore Ms. Thomas's statement and proceed with the seizure.  It is of course true that an investigator is entitled to be skeptical of a suspect's self-serving statements.[167]  But the investigator's disbelief, just like any other decision or action, must be reasonable under the circumstances.[168]  Here, Ms. Thomas and Warden Culclager were sitting in a room with Deputy Warden Pierce when Ms. Thomas told Warden Culclager that Ms. Thomas had already passed a strip-search.  It would make absolutely no sense for Ms. Thomas to lie in that situation.  Deputy Warden Pierce could have easily and immediately revealed the lie.  So, to the extent that Warden Culclager disregarded Ms. Thomas's statement because she didn't believe Ms. Thomas, such disbelief was objectively unreasonable.

Moreover, Warden Culclager had a responsibility to determine the accuracy of Ms. Thomas's statement.  The Eighth Circuit has long held that, for purposes of conducting the probable-cause or reasonable-suspicion analysis, an officer cannot "disregard plainly exculpatory evidence," especially "when a minimal further investigation" into that evidence "would have

---

concealing contraband.  *See* Feb. 21, 2023 Hr'g Tr. (Rough) at 16–19.  There's no factual support for this theory in the record.

[166] *See supra* note 65 and accompanying text.

[167] *See Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 587–88, 592 & nn.10–11 (2018).

[168] *See id.* at 588 (noting that "the plausibility of the [suspect's] explanation" impacts the reasonableness of an officer's suspicion).

exonerated the suspect."[169]  Of course, this duty is not absolute.  It arises only when there are not "exigent circumstances," such that "law enforcement would not be unduly hampered if the agents wait to obtain more facts before seeking to arrest."[170]  But in the absence of exigent circumstances, even qualified immunity will not save an officer who failed to reasonably investigate exculpatory evidence.[171]

When the Eighth Circuit grants summary judgment to an officer accused of ignoring exculpatory evidence in the probable-cause or reasonable-suspicion context, it's because a minimal investigation would not actually have revealed any evidence that negated the officer's probable-cause or reasonable-suspicion determination.[172]  So, in those cases, the failure to investigate didn't matter—the seizures would not have violated the Fourth Amendment even if the additional investigations occurred.  But the general applicability and scope of the duty to

---

[169] *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999) (quotation marks and citation omitted).

[170] *Bell v. Neukirch*, 979 F.3d 594, 604 (8th Cir. 2020) (quoting *Kuehl*, 173 F.3d at 650).

[171] *See Furlow v. Belmar*, 52 F.4th 393, 405–06 (8th Cir. 2022) (denying qualified immunity because "even minimal further investigation" would have revealed to the defendant "that probable cause (or even arguable probable cause) had dissipated" (internal quotation marks and citation omitted)); *Kuehl*, 173 F.3d at 650–51; *see also Bell*, 979 F.3d at 604, 608; *Johnson v. City of Minneapolis*, 901 F.3d 963, 971 (8th Cir. 2018); *Ross v. City of Jackson*, 897 F.3d 916, 921–23 (8th Cir. 2018); *Womack v. City of Bellefontaine Neighbors*, 193 F.3d 1028, 1031 (8th Cir. 1999); *cf. United States v. Evans*, 851 F.3d 830, 835–36 (8th Cir. 2017) (suppressing evidence because the officers failed to conduct inquiries that "might have substantially influenced the probable cause determination" and could have been conducted without "unduly hamper[ing] the performance of the officers' duties").

[172] *See Walz v. Randall*, 2 F.4th 1091, 1103 (8th Cir. 2021) ("[U]nlike in *Kuehl*, the deputies made an effort to investigate what happened," and "this case is not one in which 'minimal further investigation would have exonerated the suspect.'" (citation omitted)); *Kingsley v. Lawrence Cnty.*, 964 F.3d 690, 699–700 (8th Cir. 2020) ("[The plaintiff] has failed to demonstrate that minimal further investigation would have exonerated him."); *Nader v. City of Papillion*, 917 F.3d 1055, 1058 (8th Cir. 2019) (holding that "probable cause would have still existed" even in light of the allegedly exonerating evidence); *Duhe v. City of Little Rock*, 902 F.3d 858, 863 (8th Cir. 2018) (concluding that the officer "conducted a reasonable investigation.  He did not disregard 'plainly exculpatory evidence'" and "'minimal further investigation' . . . would not have exonerated" the plaintiffs (citation omitted)); *Gilmore v. City of Minneapolis*, 837 F.3d 827, 833 (8th Cir. 2016) (holding that "nothing the officers could have immediately discovered . . . would have exonerated" the plaintiff); *Gibson v. Cook*, 764 F.3d 810, 814 (8th Cir. 2014) ("This was not a situation where [the defendant] disregarded plainly exculpatory evidence"; "minimal further investigation would [not] have exonerated the suspect." (cleaned up)); *Joseph v. Allen*, 712 F.3d 1222, 1227 (8th Cir. 2013) ("[The witness's] testimony was not plainly exculpatory.  At most, his statements amounted to conflicting evidence."); *Amrine v. Brooks*, 522 F.3d 823, 833 (8th Cir. 2008) ("The exculpatory statement . . . was tempered by inconsistencies . . . [and] [i]t would have taken more than a minimal further investigation to sort out the inconsistencies . . . ." (quotation marks and internal citation omitted)).

investigate exculpatory evidence is accepted without hesitation in every case—whether the defendant ultimately wins or loses.  In the case at bar, then, the hard question isn't whether the duty to investigate exculpatory evidence was clearly established in October of 2020.  It was.  The hard question is whether Warden Culclager satisfied that clearly established duty.  She didn't, and she couldn't have thought she did.

A rational juror could find that Warden Culclager and Ms. Thomas sat at the conference room table for a full minute after Ms. Thomas explained that she had already passed a strip search.[173]  So there were not any exigent circumstances present when Ms. Thomas conveyed the reasonable-suspicion-defeating information.  And it would have taken at most a few seconds for Warden Culclager to ask Deputy Warden Pierce—who was either sitting at the same table or standing a few feet away from the door—whether Ms. Thomas had actually passed a strip-search. It's hard to imagine something less burdensome than one investigator taking a few seconds to ask a fellow investigator (sitting at the same table or otherwise in close proximity in the same room) a yes-or-no question.  It is clearly established in the Eighth Circuit that the failure to ask such a simple question, especially given its relevance to the investigation, is objectively unreasonable.[174] Accordingly, Warden Culclager is not entitled to qualified immunity.[175]

---

[173] *See supra* note 66 and accompanying text.

[174] *See Furlow*, 52 F.4th at 405; *Johnson*, 901 F.3d at 971; *Kuehl*, 173 F.3d at 651.

[175] Another rational reading of the record—though one less favorable to Ms. Thomas and thus not appropriate for summary judgment—would be that Ms. Thomas got up to leave the conference room mere seconds (not a minute) after saying that she had passed a strip search.  *See supra* note 66 and accompanying text.  In that case, Warden Culclager's initial orders (telling Deputy Warden Pierce to close the door and then initially telling the other officers to stop Ms. Thomas after she got past the door) would not themselves be unconstitutional because Ms. Thomas's exit could reasonably be considered an exigent circumstance that *temporarily* alleviated the duty to investigate the exculpatory statement.  *Cf. Kentucky v. King*, 563 U.S. 452, 460 (2011) (citing *United States v. Santana*, 427 U.S. 38, 42–43 (1976)).  But Warden Culclager still wouldn't be entitled to qualified immunity.  It took about three minutes for the ADC officers to detain Ms. Thomas and return her to Warden Culclager.  *See* Lobby Cam Part 2 at 6:29:45– 6:33:00.  So Warden Culclager had ample time to ask Deputy Warden Pierce if Ms. Thomas already passed a strip search.  Had she asked that question, she would have known that there was no basis to seize Ms. Thomas.  And asking Deputy Warden Pierce that question would not have "unduly hampered" any law-enforcement activity.  Warden Culclager stayed in the conference room essentially the entire three minutes (so she wasn't actively involved in the

At bottom, Ms. Thomas's unlawful-seizure claim (even considering the qualified-immunity defense) comes down to one question of historical fact: Did Warden Culclager hear Ms. Thomas the first time Ms. Thomas said that she had already passed a strip-search?  A rational juror could answer "yes" or "no" to that question.  So it's a genuinely disputed fact.  And the entire unlawful-seizure claim turns on the answer to that question.[176]  So the dispute is material.  That means Ms. Thomas's unlawful-seizure claim must go to trial.[177]

---

detention).  *Id.*  Deputy Warden Pierce simply observed (but did not aid in) the attempts to restrain Ms. Thomas in the lobby and adjoining hallway.  *See id.*; Ex. 3 (Pierce Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-3) at 15:5–7 (Deputy Warden Pierce testifying that he "did go outside . . . in the lobby area," but "did not assist" the other officers with the seizure).  There was time and opportunity for Warden Culclager to ask Deputy Warden Pierce whether Ms. Thomas had passed the strip-search.  Warden Culclager's failure to confirm the strip-search results was not even arguably reasonable.

[176] Warden Culclager will be entitled to qualified immunity if a jury finds that Warden Culclager did not actually hear Ms. Thomas say that she had already passed a strip-search.  In that situation, Warden Culclager didn't have any personal knowledge of the reasonable-suspicion-defeating fact.  It is true that knowledge of the strip-search results would likely be imputed to Warden Culclager by way of the collective knowledge doctrine.  *See United States v. Banks*, 514 F.3d 769, 776 (8th Cir. 2008) ("The collective knowledge doctrine imputes the knowledge of all officers involved in an investigation upon the seizing officer . . . .").  But Warden Culclager would be entitled to qualified immunity even with such imputed knowledge.  That's because the collective knowledge doctrine has thus far been used only to validate otherwise unlawful seizures.  *See, e.g., id.* (quoting *United States v. Gillette*, 245 F.3d 1032, 1034 (8th Cir. 2001)); *United States v. Edwards*, 891 F.3d 708, 711–12 (8th Cir. 2018).  Neither this Court nor Ms. Thomas has found a single case in which the doctrine was used to invalidate an otherwise lawful seizure and thus subject a government official to personal liability under § 1983.  *See* Feb. 21, 2023 Hr'g Tr. (Rough) at 41–43.  The qualified-immunity defense would protect Warden Culclager from being held personally liable based on such a novel application of the collective knowledge doctrine.  *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017).

[177] Ms. Thomas's related excessive-force argument fails.  *See* Br. in Supp. of Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 51) at 4–5.  Contrary to her contentions, force is not *per se* excessive merely because the underlying seizure is unconstitutional.  *See United States v. Drapeau*, 644 F.3d 646, 653–54 (8th Cir. 2011).  And the force used to execute the seizure in this case was not unreasonable.  *See Rohrbough v. Hall*, 586 F.3d 582, 585–86 (8th Cir. 2009) ("Not every push or shove . . . violates the Fourth Amendment, but force is excessive when the officers' actions are not objectively reasonable in light of the facts and circumstances surrounding them." (quotation marks and citation omitted)).  Ms. Thomas was not handcuffed.  At one point, a fellow officer (with whom Ms. Thomas was personally familiar and comfortable, *see supra* note 75) held her arm and guided her back into the conference room.  Then, after Ms. Thomas left the conference room a second time, that same officer bear-hugged Ms. Thomas from behind in order to neutralize Ms. Thomas's continued resistance—including threatened violence—to the other officers' efforts to place her in handcuffs.  Those facts do not give rise to a violation of any clearly established Fourth Amendment right.  *See Westwater v. Church*, No. 22-1685, 2023 WL 2174846, at *3 n.1 (8th Cir. Feb. 23, 2023) (reaffirming that "the question whether force used was . . . constitutionally excessive is a question of law, at the summary judgment stage and after trial" (emphasis omitted)).

## B.     First Amendment Retaliation

The First Amendment's protection against "law[s] . . . abridging the freedom of speech" prohibits government officials from retaliating against an individual because of that individual's speech.[178]  To maintain a First Amendment retaliation claim, Ms. Thomas must show that there is a genuine dispute of material fact that bears on whether (1) her speech was protected by the First Amendment, (2) Defendants took an adverse action against her that "would chill a person of ordinary firmness from speaking out," and (3) her protected speech was the but-for cause of Defendants' adverse action.[179]

Ms. Thomas brings four separate First Amendment retaliation claims.  Ms. Thomas's primary claim is that Warden Culclager's decision to fire Ms. Thomas was retaliation for protected speech.  The Court will refer to this as the "retaliatory-termination claim."  Second, Ms. Thomas claims that Deputy Warden Pierce retaliated against Ms. Thomas by having her strip-searched. The Court will refer to this as the "retaliatory-search claim."  Ms. Thomas's third claim is that Warden Culclager caused an unlawful seizure in retaliation for protected speech.  The Court will refer to this as the "retaliatory-seizure claim."  Finally, the fourth claim is that Warden Culclager caused Ms. Thomas to be blacklisted from all ADC property in retaliation for Ms. Thomas filing the instant lawsuit.  The Court will refer to this as the "retaliatory-blacklisting claim."[180]

---

[178] U.S. Const. amend. I; *see Nieves*, 139 S. Ct. at 1722.

[179] *Laney v. City of St. Louis*, 56 F.4th 1153, 1157 (8th Cir. 2023) (internal quotation marks and citations omitted). There are some Eighth Circuit cases that indicate the causation prong is satisfied so long as the employee's speech was a "substantial factor" in the employer's adverse action.  *See, e.g.*, *id.* 1157 n.2 (collecting cases).  The Eighth Circuit recently clarified, however, that a First Amendment retaliation claim requires but-for causation.  *Id.*

[180] At oral argument, Ms. Thomas posited a possible fifth claim: that Warden Culclager's post-detention order for Ms. Thomas to be strip-searched was a malicious threat (made in retaliation for Ms. Thomas's protected speech) to force Ms. Thomas to undergo an additional, unnecessary strip-search.  *See* Feb. 21, 2023 Hr'g Tr. (Rough) at 4–5, 46.  This claim fails.  No rational juror could conclude that Warden Culclager ordered the post-detention strip-search with a retaliatory motive.  As soon as someone other than Ms. Thomas told Warden Culclager that a strip-search had already happened, Warden Culclager abandoned the order.  *See supra* notes 91–95 and accompanying text.  A rational juror could instead conclude only that Warden Culclager's post-detention strip-search order was based on either a lack of

For various reasons discussed below, Ms. Thomas's retaliatory-termination, retaliatory-search, and retaliatory-blacklisting claims fail.[181]   Her retaliatory-seizure claim against Warden Culclager, however, proceeds to trial.

### 1.    Retaliatory-Termination Claim

Ms. Thomas bears the burden of showing that she engaged in speech protected by the First Amendment.[182]   Typically, the First Amendment covers an extremely wide variety of speech.   But that is less true when the government acts as an employer, rather than as a sovereign.   The Supreme Court—in *Pickering v. Board of Education of Township High School District 205* and a series of subsequent cases—has made clear that the government's interest in the efficient administration of public work allows it to discipline or discharge an employee based on speech even if a non-employee would be immune from punishment for the same speech.[183]   To be sure, the First Amendment still protects a citizen who takes a job with the government.   The scope of protected activity just becomes far narrower with respect to their employment.   A public employee is protected from retaliation only if the retaliation-inducing speech was on "a matter of public

---

knowledge about the initial strip-search or a conscious disbelief of Ms. Thomas's statement that she had already passed a strip-search.

[181] Ms. Thomas doesn't specify whether the retaliatory-termination claim is brought against both Defendants or only Warden Culclager.   To the extent Ms. Thomas did bring the retaliatory-termination claim against Deputy Warden Pierce, it fails.   There's no evidence that Deputy Warden Pierce was the cause of Ms. Thomas's termination.   True, he wrote a letter to Warden Culclager that recommended termination.   But it was just that—a recommendation.   The alleged retaliation took place when Warden Culclager independently decided to terminate Ms. Thomas.   Thus, the retaliatory-termination claim is properly brought only against Warden Culclager.   Likewise, there is no clarification as to whether the retaliatory-search claim is brought against both Defendants or just Deputy Warden Pierce.   This claim cannot be brought successfully against Warden Culclager.   There's no evidence in the record that she played any role in the decision to strip-search Ms. Thomas.   Finally, the retaliatory-seizure claim can be brought only against Warden Culclager for the reasons stated *supra* note 159.

[182] *See Altman v. Minn. Dep't of Corr.*, 251 F.3d 1199, 1202 (8th Cir. 2001).

[183] 391 U.S. 563, 568 (1968).

concern . . . ."[184]  So, the critical question is whether Ms. Thomas spoke on a matter of public concern.  She did not.

Protected speech can take the form of spoken words or nonverbal expressive conduct.[185]  Ms. Thomas argues that the following statements and actions were protected by the First Amendment: (1) her criticisms of Deputy Warden Pierce while waiting outside the conference room before the strip-search; (2) her silence and attempt to leave in response to Warden Culclager's questions in the conference room; (3) her refusal to be detained and handcuffed; and (4) her statement that she was entitled to Warden Culclager's respect.[186]

---

[184] *Connick v. Myers*, 461 U.S. 138, 147 (1983).  Determining whether a public employee's speech is protected by the First Amendment is a two-part inquiry.  First, the speech must be on a matter of public concern.  *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006).  Second, courts conduct the so-called *Pickering* balancing test—a multi-factor inquiry designed to determine whether an employee's speech caused, or could have been reasonably expected to cause, disruption to the efficient administration of government work.  *See id.*; *Anzaldua v. Ne. Ambulance & Fire Prot. Dist.*, 793 F.3d 822, 833–36 & n.3 (8th Cir. 2015).  The Court need not reach the *Pickering* balancing test in this case because Ms. Thomas did not speak on a matter of public concern.  Even if the Court did reach that step, Defendants would win.  For starters, the *Pickering* balancing test would favor Defendants on the merits.  *See Anzaldua*, 793 F.3d at 833–34 ("We have given substantial weight to government employers' reasonable predictions of disruption, even when the speech involved is on a matter of public concern." (cleaned up)); *Shands v. City of Kennett*, 993 F.2d 1337, 1344 (8th Cir. 1993) (noting the "significant interest" of "public safety organization[s]" in "promot[ing] efficiency, foster[ing] loyalty and obedience to superior officers, maintain[ing] morale, and instill[ing] public confidence" (citation omitted)).  And even if the *Pickering* merits weren't so obvious, Defendants would be entitled to qualified immunity.  The Eighth Circuit has held that, as a general matter, "because *Pickering*'s constitutional rule turns upon a fact-intensive balancing test, it can rarely be considered 'clearly established' for purposes of . . . qualified immunity."  *Hemminghaus v. Missouri*, 756 F.3d 1100, 1114 (8th Cir. 2014) (quoting *Bartlett v. Fisher*, 972 F.2d 911, 916 (8th Cir. 1992)).  Qualified immunity will be denied in the absence of workplace-disruption evidence.  *See Sexton v. Martin*, 210 F.3d 905, 914 (8th Cir. 2000).  Evidence of the employer's reasonable prediction that workplace disruption will occur is sufficient.  *See Anzaldua*, 793 F.3d at 835; *Hemminghaus*, 756 F.3d at 1114.  Here, it is beyond dispute that Ms. Thomas's speech and behavior did cause—or at the very least could have been reasonably expected to cause—disruption in the prison.  *See Connick*, 461 U.S. at 153 & n.14 (noting that an employee "violat[ing] announced office policy" would "strengthen [the employer's] position"); *Anzaldua*, 793 F.3d at 835 (noting the high degree of deference given to an employer's "determination that [the employee's speech] had caused or would cause dissension and disruption, and to its response to the actual or perceived disruption," especially when the employee speech "arises from an employment dispute" (internal quotation marks and citations omitted)).  Accordingly, Defendants are entitled to summary judgment and qualified immunity on the *Pickering* balancing prong too.

[185] *See Curtis v. Christian Cnty.*, 963 F.3d 777, 783 (8th Cir. 2020).

[186] *See* Am. Compl. (Doc. 9) ¶¶ 12–14; Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49) ¶¶ 3, 7–9; Br. in Supp. of Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 51) at 16–18.

Determining whether speech is on a matter of public concern requires examination of "the content, form, and context of" the speech.[187]  As for the content of her speech, Ms. Thomas's Amended Complaint and summary-judgment Response Brief make her out to be a civil rights crusader.  She paints her comments to Deputy Warden Pierce as protests against an allegedly unconstitutional strip-search.[188]  Her silence and attempt to leave during Warden Culclager's questioning are portrayed as nonverbal expressive actions communicating that Ms. Thomas didn't believe that Warden Culclager had the authority to demand answers from an employee who wished to remain silent.[189]  She contends that her refusal to be handcuffed was speech in defiance of an unconstitutional seizure.[190]  And she says that her statement demanding respect from Warden Culclager was a "protest protected by the [First] Amendment."[191]  In short, Ms. Thomas thinks that she spoke on a matter of public concern because she took a stand against Defendants' abuses of power.  For purposes of summary judgment, the Court will assume that a rational juror could agree with Ms. Thomas about the content of her speech.  Even with the benefit of that extremely generous assumption, her retaliatory-termination claim doesn't survive summary judgment.

The content of speech is not sufficient to resolve the matter-of-public-concern analysis.  The form and context of the speech must also be considered.  That's because form and context reveal a speaker's motivation.  And, in the Eighth Circuit, a public employee is protected against

---

[187] *Connick*, 461 U.S. at 147–48.

[188] *See* Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49) ¶ 9 (Ms. Thomas acknowledging that she "criticized Defendants" and describing that criticism as an invocation of "her right to be free from unreasonable search and seizure").

[189] *See* Br. in Supp. of Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 51) at 16–18 (arguing that the evidence which supports Warden Culclager's insubordination argument—i.e., Ms. Thomas's refusal to answer questions—equally supports Ms. Thomas's claims of First Amendment retaliation and compelled testimony under the Fifth Amendment).

[190] Am. Compl. (Doc. 9) ¶ 12; Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49) ¶ 3.

[191] Am. Compl. (Doc. 9) ¶ 14.

retaliation only when that employee speaks primarily out of a concern for the public welfare.[192] Indeed, the Eighth Circuit has held speech unprotected even when the speech was on topics that would have inarguably interested the public.[193]   Accordingly, unless Ms. Thomas was "primarily motivated by public concern," the First Amendment isn't a shield against termination.[194]

The foregoing doctrinal rules, which this Court must take as a given, make the analysis here an easy call.  There's no suggestion in this record that Ms. Thomas was trying to shine a light on official misconduct.  Instead, her speech was completely internal to the workplace.[195]  The speech arose in the context of a dispute between herself and her supervisors.  She was objecting in the moment to the way that her supervisors were exercising their workplace authority over her. She was motivated primarily, if not entirely, by her personal interests in avoiding a prolonged workplace search and interrogation, staying out of handcuffs, and justifying her behavior so that she would not lose her job.  In short, Ms. Thomas's retaliatory-termination claim fails because she did not speak on a matter of public concern.[196]

---

[192] *See, e.g.*, *Nagel v. City of Jamestown*, 952 F.3d 923, 930 (8th Cir. 2020).

[193] In *Buazard v. Meridith*, the Eighth Circuit held that an employee's refusal to comply with an order to falsify a document wasn't protected speech because there was "no indication that [the employee] . . . was taking any action as a concerned citizen, rather than simply as an employee following orders or refusing to follow them."  172 F.3d 546, 548–49 (8th Cir. 1999).  In *Sparr v. Ward*, an internal memorandum containing "allegations of sexual harassment" was not protected speech because there was "no evidence suggesting [the speaker's] motivation for providing the memorandum . . . was intended to bring the allegations . . . into the public eye."  306 F.3d 589, 594–95 (8th Cir. 2002); *see also McCullough v. Univ. of Ark. Med. Scis.*, 559 F.3d 855, 865–67 (8th Cir. 2009).  And in *Altonen v. City of Minneapolis*, an employee who brought a lawsuit under a state's information-disclosure statute hadn't engaged in protected speech because she was motivated by "her personal interest in obtaining access to her files, not to provide the public with information."  487 F.3d 554, 559–60 (8th Cir. 2007).

[194] *Anzaldua*, 793 F.3d at 833 (citation omitted).

[195] *See Sparr*, 306 F.3d at 595; *Buazard*, 172 F.3d at 549.

[196] Whether an employee engaged in protected speech is a question of law for the Court to resolve.  *Shands*, 993 F.2d at 1342.  Courts may find it necessary to submit interrogatories to a jury, however, when there are factual disputes that bear on the protected-speech analysis.  *See id.*  It's not entirely clear whether the employee's motivation is an underlying factual question to be resolved by a jury or a subsidiary legal conclusion for the Court.  In *Shands*, the Eighth Circuit instructed that "the jury should decide *factual* questions such as the *nature* and substance of the plaintiff's speech activity . . . ." *Id.* (emphasis added).  On the other hand, more recent Eighth Circuit cases seem to treat the question of motivation as one for the Court.  *See Hemminghaus*, 756 F.3d at 1111–12; *McCullough*, 559 F.3d

## 2.    Retaliatory-Search Claim

*Pickering*'s public-concern framework applies to the retaliatory-search claim.  Ms. Thomas was subject to a strip-search due to her status as an ADC employee, and Deputy Warden Pierce ordered the strip-search pursuant to the ADC's procedures that govern employee screening.  Put another way, the allegedly retaliatory action came by way of Deputy Warden Pierce exercising authority as an employee supervisor.    So this claim is properly analyzed under *Pickering*.  Accordingly, Ms. Thomas's retaliatory-search claim fails because she has not shown that she spoke on a matter of public concern.

Even if *Pickering* didn't apply, such that her speech was entitled to greater First Amendment protection, Ms. Thomas's retaliatory-search claim has two causation-prong problems.  First, there is a glaring timeline issue: The allegedly retaliation-inducing speech—her comments to Deputy Warden Pierce—came after Deputy Warden Pierce asked her to be strip-searched.  It's impossible for Deputy Warden Pierce to have retaliated against Ms. Thomas for something she hadn't even said yet.    Second, the strip-search's constitutionality under the Fourth Amendment dooms the First Amendment retaliation claim.  A plaintiff who claims that she was searched or seized in retaliation for protected speech typically must show that the search or seizure violated the Fourth Amendment.[197]  Ms. Thomas acknowledges that such a showing is crucial to her case.[198]  If a search or seizure was appropriate under the Fourth Amendment, then the government official had objectively reasonable grounds to search or seize the plaintiff.  This essentially defeats a but-for causal link between the speech and the search or seizure.[199]  The strip-search was entirely

---

at 866.  In any event, a jury wouldn't be necessary in this case even if Ms. Thomas's motivation is a question of fact—on this record, a rational juror could only conclude that Ms. Thomas's speech was motivated by her personal interests.

[197] *See Nieves*, 139 S. Ct. at 1722–24, 1727.

[198] Br. in Supp. of Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 51) at 12.

[199] *Nieves*, 139 S. Ct. at 1722–24.

constitutional.  That means Deputy Warden Pierce's retaliatory motive (assuming one could have even existed) wouldn't have been a but-for cause of the strip-search.[200]

### 3.    Retaliatory-Seizure Claim

Ms. Thomas says that Warden Culclager maliciously ordered the seizure in retaliation for protected speech.  Based on reasonable inferences from the most pro-plaintiff read of the facts, a rational juror could agree that Warden Culclager's decision to restrain Ms. Thomas (as opposed to the less severe option of letting Ms. Thomas leave and firing her) was the result of a retaliatory motive or, at the very least, a serious disapproval of Ms. Thomas's statements and conduct. There's no doubt that a physical-force seizure is the type of adverse action that "would chill a person of ordinary firmness from speaking out."[201]  And that seizure, as already discussed, clearly violated the Fourth Amendment.  Prongs two and three of the test are satisfied for purposes of summary judgment.  This claim turns on the protected-speech prong, at least at this stage.

*Pickering* does not apply to the protected-speech prong of this claim.  It is well established that *Pickering* and its progeny's relaxed First Amendment scrutiny flows from the "common-sense" premise that government actors have more flexibility when exercising employer authority as opposed to sovereign authority.[202]  Such a rule necessarily places the focus on the nature of a defendant's adverse action: Was the defendant functioning as an employer or as an agent of the sovereign?[203]

---

[200] *Id.* at 1722 ("It is not enough to show that an official acted with a retaliatory motive . . . [the motive] must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." (quoting *Hartman v. Moore*, 547 U.S. 250, 260 (2006)).

[201] *Laney*, 56 F.4th at 1157 (internal quotation marks and citation omitted).

[202] *Nat'l Aeronautics & Space Admin. v. Nelson*, 562 U.S. 134, 148–49 (2011) (citing *Connick*, 461 U.S. at 143); *see also Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 598–601 (2008).

[203] *See Altman*, 251 F.3d at 1202; *Burnham v. Ianni*, 119 F.3d 668, 678 (8th Cir. 1997) (en banc); *cf. Nelson*, 562 U.S. at 148.

34

With respect to the retaliatory-termination claim and the retaliatory-search claim, Defendants were clearly wearing their employer hats. Not so with respect to this retaliatory-seizure claim. Warden Culclager exercised sovereign authority when she ordered the seizure of Ms. Thomas. Indeed, Warden Culclager's own arguments foreclose any other conclusion. At oral argument, she specifically and repeatedly made clear that the seizure was done pursuant to her law-enforcement authority.[204]

Warden Culclager's justification for the seizure is that she suspected Ms. Thomas of violating Arkansas's criminal statute that prohibits smuggling contraband into a prison.[205] Seizing someone suspected of violating a criminal law is a paradigmatic exercise of sovereign authority.[206] Warden Culclager drives this point home by arguing that Arkansas's citizen-arrest statute gave her the power to seize Ms. Thomas: That statute (1) has no employment-specific characteristics and (2) authorizes citizens to seize people suspected of committing a felony (not a workplace-conduct-policy violation).[207] Finally, by disclaiming any notion that she seized Ms. Thomas because Ms. Thomas presented a threat to the safe or efficient administration of the prison's work,[208] Warden Culclager has taken off the board any suggestion that the seizure was purely an employment-related act.

---

[204] *See* Feb. 21, 2023 Hr'g Tr. (Rough) at 21–25.

[205] *See id.*; Ark. Code Ann. § 5-54-119(a).

[206] *See Shinn v. Ramirez*, 142 S. Ct. 1718, 1730 (2022) ("From the beginning of our country, criminal law enforcement has been primarily a responsibility of the States. The power to convict and punish criminals lies at the heart of the States' residuary and inviolable sovereignty." (internal quotation marks and citations omitted)); *Heath v. Alabama*, 474 U.S. 82, 93 (1985) ("Foremost among the prerogatives of sovereignty is the power to create and enforce a criminal code.").

[207] *See* Ark. Code Ann. § 16-81-106(d). Warden Culclager primarily relies on this statute as a defense against Ms. Thomas's state common law claims. *See* Br. in Supp. of Defs.' Mot. for Summ. J. (Doc. 39) at 28–29. Still, her reliance on the citizen-arrest statute is relevant insofar as it further clarifies that she considered herself to be acting in a law-enforcement capacity. *See* Feb. 21, 2023 Hr'g Tr. (Rough) at 22–23.

[208] *See* Feb. 21, 2023 Hr'g Tr. (Rough) at 21–22.

In light of Warden Culclager's arguments, the case at bar is not meaningfully different than any other case in which a police officer unreasonably seized a suspect because the officer didn't care for the suspect's lack of decorum.  And it's clearly established that such seizures violate the First Amendment.[209]  Accordingly, Warden Culclager is not entitled to qualified immunity on this claim.

It is true that, so far as this Court can tell, no other court has addressed the constitutionality of a prison warden's decision—made in the midst of an *impromptu* criminal investigation—to physically seize an employee-suspect in retaliation for the employee-suspect's allegedly disrespectful speech.  And qualified immunity often goes hand-in-hand with a first-of-its-kind legal ruling.  But not always.  "A general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful."[210]  Warden Culclager's decision to seize Ms. Thomas—concededly made with her sovereign hat on as opposed to her employer hat—was obviously subject to the clearly established constitutional rule that a police officer can't seize a suspect merely because the officer considered the suspect's speech disrespectful.

### 4.    Retaliatory-Blacklisting Claim

Ms. Thomas brings the retaliatory-blacklisting claim against Warden Culclager in her individual and official capacities.  Ms. Thomas seeks compensatory and punitive damages from Warden Culclager, individually.[211]  She wants the Court to enter an injunction to prevent Warden

---

[209] *See, e.g.*, *Molina v. City of St. Louis*, 59 F.4th 334, 343–44 (8th Cir. 2023); *Garcia v. City of New Hope*, 984 F.3d 655, 669–70 (8th Cir. 2021); *Thurairajah v. City of Fort Smith*, 925 F.3d 979, 984–85 (8th Cir. 2019); *Hoyland v. McMenomy*, 869 F.3d 644, 655–57 (8th Cir. 2017).

[210] *Doe v. Aberdeen Sch. Dist.*, 42 F.4th 883, 893 (8th Cir. 2022) (cleaned up).

[211] Suppl. Compl. (Doc. 31) ¶¶ 1, 17–19.

Culclager, in her official capacity, from "continu[ing] to retaliate against" Ms. Thomas."[212]  Ms. Thomas's retaliatory-blacklisting claim arises from conduct that took place after she was fired from the ADC.  So the protected-activity prong of this First Amendment retaliation claim is not analyzed under *Pickering*.  And her act of filing the instant lawsuit was activity protected by the First Amendment.[213]  But Ms. Thomas isn't out of the woods.  Her retaliatory-blacklisting claim has other deficiencies.

The record simply doesn't support Ms. Thomas's claim.  For starters, there is no evidence in the record of any ADC "policy" (written or unwritten) blacklisting former employees who file suit.  The only mention of any policy is in Ms. Thomas's legal argument.[214]  And Ms. Thomas's only evidence linking the blacklisting to her filing the case at bar is an ADC officer's statement that he heard from someone else that Ms. Thomas was blacklisted because she filed this lawsuit.[215]  That doesn't cut it.

"A party opposing a motion for summary judgment must show that admissible evidence will be available at trial to establish a genuine issue of material fact."[216]  "Inadmissible hearsay evidence alone may not defeat a summary judgment motion."[217]  Ms. Thomas's evidence is inadmissible hearsay.[218]  To survive summary judgment, Ms. Thomas needs "other independent

---

[212] *Id.* ¶ 17.

[213] *See Eggenberger v. W. Albany Twp.*, 820 F.3d 938, 943 (8th Cir. 2016) (filing of a lawsuit is protected activity so long as the lawsuit is not brought "for purposes of harassment, vexatiousness [or] otherwise in bad faith" (citation omitted)).

[214] *See* Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49) ¶ 12.

[215] *See* Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 94:18–23.

[216] *Lackey v. Wells Fargo Bank, N.A.*, 747 F.3d 1033, 1038 (8th Cir. 2014) (quoting *Millon v. JPMorgan Chase Bank, N.A.*, 518 F. App'x 491, 496 (8th Cir. 2013)).

[217] *Firemen's Fund Ins. Co. v. Thien*, 8 F.3d 1307, 1310 (8th Cir. 1993).

[218] *See* Fed. R. Evid. 801(c).  Ms. Thomas's testimony contains at least one instance (and likely two instances) of hearsay.  The first instance is Ms. Thomas's testimony that the ADC officer said Ms. Thomas was blacklisted because of this lawsuit.  To be fair, it's at least possible that this ADC-officer-to-Ms. Thomas statement actually falls outside the scope of the hearsay rule.  A statement "offered against an opposing party" that "was made by the party's agent or

evidence establishing" retaliation.[219]   She has provided no such evidence.   That failure is an independent and adequate reason to grant Warden Culclager summary judgment.   Absent such evidence, no rational juror could find in favor of Ms. Thomas.[220]

Overlooking the admissibility issue wouldn't change anything.   There are serious gaps in Ms. Thomas's testimony and the rest of the record.   Nowhere in the record is the relevant decisionmaker identified.   Given that Ms. Thomas has sued only Warden Culclager on this claim, it's obvious that Ms. Thomas thinks Warden Culclager is responsible for the blacklisting.   But there's no actual evidence for that proposition.   Indeed, there's no record evidence that Warden Culclager was in any way involved in either the ADC's decision to blacklist Ms. Thomas or Wellpath's decision to terminate Ms. Thomas's employment.   As a matter of both Article III standing and § 1983 liability, Ms. Thomas must produce evidence from which a rational juror could conclude that her blacklisting from the ADC and her termination from Wellpath were caused

---

employee on a matter within the scope of that relationship and while it existed" is not hearsay. Fed. R. Evid. 801(d)(2)(D).   There's not enough information in the record to know whether the ADC officer's statement satisfies this rule.   That's an entirely different problem for Ms. Thomas: It's her burden to show the presence of admissible evidence. *Lackey*, 747 F.3d at 1038.   In any event, assuming that the ADC officer made the statement within the scope of his employment would only eliminate one level of hearsay.   The second level of hearsay comes from the fact that the ADC officer's statement to Ms. Thomas was simply relaying another person's statement to that ADC officer: "[the ADC officer] was told [the blacklisting] was because of [this] lawsuit." Ex. 1 (Thomas Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-1) at 94:22–23.   So Ms. Thomas's testimony would actually be a conduit for the unsworn and unexamined testimony of the ADC officer's unidentified source. *See* Fed. R. Evid. 805.

[219] *Pink Supply Corp. v. Hiebert, Inc.*, 788 F.2d 1313, 1319 (8th Cir. 1986).

[220] Ms. Thomas finds herself in a situation very much like the one faced by the plaintiff in *Mays v. Rhodes*:

> While [the Court] review[s] the record in the light most favorable to [Ms. Thomas] as the non-moving party, [the Court] do[es] not stretch this favorable presumption so far as to consider as evidence statements found only in inadmissible hearsay.   The unsworn account[] in question [is] inadmissible hearsay; moreover, [Ms. Thomas] has failed to obtain deposition testimony or affidavits from the [ADC officer] who gave [this] unsworn account[], and thus she has failed to provide any evidence from [this] source[] that even potentially would be admissible at trial.

255 F.3d 644, 648 (8th Cir. 2001) (internal citations omitted).

by Warden Culclager's actions. She has not. This lack of personal-involvement evidence is fatal to both the individual-capacity and official-capacity claims.[221]

### C.        Fifth Amendment Claims

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ."[222] This is commonly referred to as the right against self-incrimination or the right to remain silent. Ms. Thomas contends that she had a right to remain silent because Warden Culclager was investigating a crime. Remaining silent in response to Warden Culclager's questions in the conference room was supposedly her way of invoking that right. And Warden Culclager conceded that Ms. Thomas was fired at least in part for refusing to answer those questions. Thus, the argument goes, Warden Culclager unlawfully conditioned Ms. Thomas's employment on Ms. Thomas waiving her Fifth Amendment right to remain silent.

Ms. Thomas bases her argument on the Supreme Court case *Garrity v. New Jersey*.[223] There, the Attorney General of New Jersey, upon the order of the Supreme Court of New Jersey, was investigating "alleged irregularities in handling cases in the municipal courts . . . ."[224] The Attorney General's investigation included questioning police officers in those municipalities.[225] The officers were told they could invoke their right to remain silent, but that state law would

---

[221] *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (Article III standing requires "a causal connection between the injury and . . . the challenged action of the defendant" (quotation marks and citation omitted)); *id.* at 561 ("[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of litigation."); *Church v. Missouri*, 913 F.3d 736, 748 (8th Cir. 2019) (A defendant sued in his or her official capacity "must have some connection to the enforcement of the challenged laws." (internal quotation marks and citation omitted)); *White v. Jackson*, 865 F.3d 1064, 1081 (8th Cir. 2017) ("To prevail on a § 1983 claim, a plaintiff must show each individual defendant's personal involvement in the alleged violation.").

[222] U.S. Const. amend. V.

[223] 385 U.S. 493 (1967).

[224] *Id.* at 494.

[225] *Id.* at 494–95.

subject them to termination if they refused to answer questions.[226]   The officers answered the

questions; their answers were introduced at subsequent criminal trials; and the officers were

convicted.[227]   The Supreme Court ultimately reversed the convictions because the officers'

answers were coerced by the threat of termination.[228]

Ms. Thomas reads *Garrity* to mean that Warden Culclager couldn't fire Ms. Thomas for

refusing to answer questions.   The problem for Ms. Thomas is that the Eighth Circuit has read

*Garrity* and its progeny differently:

> The Fifth Amendment not only protects the individual against being involuntarily
> called as a witness against himself in a criminal prosecution but also privileges him
> not to answer official questions put to him in any other proceeding, civil or criminal,
> formal or informal, where the answers might incriminate him in future criminal
> proceedings.  The Amendment is violated when public employees are compelled to
> testify by employers who require the employees to either incriminate themselves or
> to forfeit their jobs.  As long as a public employer does not demand that the public
> employee relinquish the employee's constitutional immunity from prosecution,
> however, the employee can be required to either testify about performance of
> official duties or to forfeit employment.  Given the important public interest in
> securing from public employees an accounting of their public trust, public
> employees may constitutionally be discharged for refusing to answer potentially
> incriminating questions concerning their official duties if they have not been
> required to surrender their constitutional immunity.  The Fifth Amendment is
> violated only by the combined risks of both compelling the employee to answer
> incriminating questions and compelling the employee to waive immunity from the
> use of those answers.[229]

In short, no Fifth Amendment violation occurs unless and until the employee is required (under

pain of termination) to both answer questions and waive immunity from those answers being used

in a criminal prosecution.  Here, Ms. Thomas was never threatened with termination if she didn't

answer questions.   She was never told that she had to give up any immunity from her answers

---

[226] *Id.* at 494 & n.1.

[227] *Id.*

[228] *Id.* at 500.

[229] *Hill v. Johnson*, 160 F.3d 469, 471 (8th Cir. 1998) (cleaned up).

being used against her in a criminal prosecution.  And, of course, there was no such prosecution.

Thus, Ms. Thomas suffered no violation of her Fifth Amendment rights under *Garrity* and its

progeny.[230]

### D.    Fourteenth Amendment Claims

Ms. Thomas's final federal constitutional claim is that she was fired without due process.[231]

The Fourteenth Amendment guarantees due process before the government deprives a person of

property.[232]  State law can give rise to a constitutionally protected "property" interest in continued

employment by, among other things, guaranteeing that an employee will keep his or her job for

some specified period of time.[233]  On the other hand, a public employer can essentially fire an "at

---

[230] At oral argument, Ms. Thomas asked this Court to extend *Garrity*.  She concedes that she was never explicitly threatened with termination if she didn't answer questions.  *See* Feb. 21, 2023 Hr'g Tr. (Rough) at 51.  Instead, Ms. Thomas argues that she was threatened with things that amounted to an implicit threat of termination.  For example, Ms. Thomas points to Warden Culclager's threat to call the Arkansas State Police and the order to conduct a (second) strip-search as parts of this implicit threat against Ms. Thomas's job.  *See id.* at 51–52.  Even assuming arguendo that the Court adopted Ms. Thomas's implied-threat-of-termination rationale, her *Garrity* claim would still fail.  That's because it's missing one key ingredient: Ms. Thomas was never forced into waiving her constitutional immunity from having her incriminating statements used against her in a criminal trial.  Whatever the merits of the implied-threat theory, *Garrity* remains a Fifth Amendment self-incrimination case.  To dispense with the self-incrimination element would turn *Garrity* into a First Amendment compelled-speech doctrine.  And a compelled-speech claim based on Ms. Thomas's *Garrity* theory would directly conflict with the Eighth Circuit's statements that an employer can fire an employee for refusing to answer questions so long as the employee's self-incrimination immunity is not implicated.  *See Hill*, 160 F.3d at 471.  Finally, even if Ms. Thomas's *Garrity*-extension argument is legally correct, Ms. Thomas candidly concedes that she is unaware of any case adopting this rule.  Qualified immunity would, therefore, almost certainly be appropriate.  *See* Feb. 21, 2023 Hr'g Tr. (Rough) at 52.

[231] Ms. Thomas's Amended Complaint is not at all clear as to the nature of her Fourteenth Amendment Due Process Clause claim.  Defendants initially attacked the claim as an improper invocation of the substantive-due-process doctrine.  *See* Br. in Supp. of Defs.' Mot. for Summ. J. (Doc. 39) at 21–22 (citing *Graham v. Connor*, 490 U.S. 386, 393–95 (1989)).  And, to the extent she was trying to bring a procedural due process claim, it's hard to piece one together from the facts she alleged.  Ms. Thomas, in one paragraph of her summary-judgment Response (but not in her summary-judgment Response Brief at all), indicated that she intended to bring a procedural due process claim based on insufficient pre- and post-termination procedures.  *See* Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49) ¶ 14.  Defendants did not attack this version of Ms. Thomas's Fourteenth Amendment claim in their summary-judgment Reply Brief.  But, at oral argument on Defendants' Motion, both sides were given the opportunity to address Ms. Thomas's Fourteenth Amendment claim.  *See* Feb. 21, 2023 Hr'g Tr. (Rough) at 28–30, 45–46.  Accordingly, and as Ms. Thomas concedes, the question of whether Defendants are entitled to summary judgment on this particular claim is properly before the Court.  *See id.* at 7–8.

[232] U.S. Const. amend. XIV.

[233] *See Otto v. City of Victoria*, 685 F.3d 755, 760 (8th Cir. 2012).

will" employee at any time and in any manner without implicating the Due Process Clause.[234]  At oral argument, Defendants conceded that this claim should go to trial if a rational juror could conclude that Ms. Thomas was not an at-will employee.[235]  But there is no evidence in this record, even when read in the light most favorable to Ms. Thomas, that would allow such a conclusion.

Asked if Ms. Thomas was an at-will employee, Warden Culclager testified, "Not that I'm aware of,"[236] while Deputy Warden Pierce testified, "As far as I know."[237]  These two answers offer very little information.  They are essentially both saying, "I don't know."  A rational juror really couldn't draw any non-speculative inferences from either answer.  There is, however, one piece of documentary evidence that is arguably relevant: the ADC's Employee Conduct Standards and Discipline Administrative Directive.  That Administrative Directive states, "These guidelines and procedures . . . do not create any legally enforceable interest or limit the Director's or his designee's authority to terminate any employee at will."[238]

That's the entirety of the record evidence as it relates to the at-will-employment issue.  Especially in light of the Administrative Directive, a rational juror would have to speculate in order to find that Ms. Thomas was not an at-will employee.  Accordingly, Ms. Thomas has not met her burden of identifying record evidence that would allow a rational juror to find in her favor on the at-will-employment issue.[239]  Defendants are entitled to summary judgment on Ms. Thomas's procedural due process claim.

---

[234] *See id.* ("[Plaintiff], by contrast, was an at-will employee, and the City's termination of his employment did not deprive him of a property interest protected by the Fourteenth Amendment.").

[235] *See* Feb. 21, 2023 Hr'g Tr. (Rough) at 30.

[236] Ex. 2 (Culclager Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-2) at 63:17–22.

[237] Ex. 3 (Pierce Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 49-3) at 48:14–17, 50:3–8.

[238] Ex. 7 (AD 12-33) to Defs.' Mot. for Summ. J. (Doc. 37-7) at 1.

[239] *See* Fed. R. Civ. P. 56(c)(1); *Erickson v. Nationstar Mortg.*, 31 F.4th 1044, 1048 (8th Cir. 2022).

## II.    State Law Claims

Ms. Thomas brings several claims under the Arkansas Constitution, the Arkansas Civil Rights Act, and Arkansas common law.  With respect to the state constitutional and state civil rights statutory claims, the parties agree that those claims rise and fall with Ms. Thomas's federal constitutional claims brought under 42 U.S.C. § 1983.[240]  But Ms. Thomas's common law claims— invasion of privacy, battery, and false imprisonment—are not all so easily resolved.[241]

The invasion-of-privacy claim is out.  As a procedural matter, it seems that Ms. Thomas has abandoned the claim: In the state-law-claim section of Ms. Thomas's summary-judgment Response Brief, there is a conspicuous absence of any invasion-of-privacy arguments.[242]  And that is despite the fact that Defendants specifically attacked the invasion-of-privacy claim in their opening summary-judgment Brief.[243]  In any event, Defendants are right on the merits.  Ms. Thomas's invasion-of-privacy claim was premised on the strip-search.[244]  To succeed on an invasion-of-privacy claim, Ms. Thomas would eventually have to prove that Defendants lacked either legal authority or Ms. Thomas's permission to conduct the strip-search.[245]  Ms. Thomas consented to the search.  And even if she didn't (i.e., the consent wasn't voluntary), the strip-search was authorized by federal law (the Fourth Amendment) and state regulations (the ADC's entry-

---

[240] *See* Defs.' Mot. for Summ. J. (Doc. 37) ¶ 5; Br. in Supp. of Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 51) at 2 n.1; Feb. 21, 2023 Hr'g Tr. (Rough) at 52–53.

[241] Am. Compl. (Doc. 9) ¶¶ 27–32.

[242] *See* Br. in Supp. of Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 51) at 21–22.

[243] *See* Br. in Supp. of Defs.' Mot. for Summ. J. (Doc. 39) at 23–25.

[244] Ms. Thomas never specified in her Amended Complaint exactly what she considered to be an invasion of privacy. The strip-search is the only logical basis for an invasion-of-privacy claim.

[245] *See McMullen v. McHughes Law Firm*, 2015 Ark. 15, at 13–14, 454 S.W.3d 200, 209 (2015).

procedures policies).[246]  So Defendants are entitled to summary judgment on the invasion-of-privacy claim.

The Court declines to resolve Ms. Thomas's battery and false-imprisonment claims.  This is not a decision lightly made.  Congress, through 28 U.S.C. § 1367, has granted this Court supplemental jurisdiction over these claims.[247]  And when Congress vests a federal court with jurisdiction, there is typically a duty to exercise that jurisdiction.[248]  Like any other legal duty, however, there are exceptions.  This is especially true with supplemental jurisdiction—in § 1367(c), Congress codified four grounds on which a district court "may decline to exercise supplemental jurisdiction":

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.[249]

Section 1367(c)(1)—the presence of "a novel or complex issue of State law"—is particularly important here.  The Eighth Circuit has held that a district court *may* "decline to retain jurisdiction . . . at any time in the litigation" on this basis.[250]  But, of course, that doesn't answer the question of whether this Court *should* decline jurisdiction in this case.  For the following reasons, the Court

---

[246] Ms. Thomas hasn't argued that the ADC's entry-procedures regulations are invalid under Arkansas state law.

[247] All parties to this lawsuit are residents of Arkansas.  *See* Am. Compl. (Doc. 9) ¶ 1.  So the Court would not have diversity jurisdiction over the state common law claims.  *See* 28 U.S.C. § 1332.

[248] *See Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996).

[249] *See* 28 U.S.C. § 1367(c).

[250] *Innovative Home Health Care, Inc. v. P.T.-O.T. Assocs. of the Black Hills*, 141 F.3d 1284, 1287–88 (8th Cir. 1998); *see Int'l Ass'n of Firefighters of St. Louis v. City of Ferguson*, 283 F.3d 969, 976 (8th Cir. 2002) (noting that novelty or complexity of state law is an adequate ground, on its own, to support dismissal).

concludes that the principles of comity and federalism inherent to § 1367(c)(1) counsel against federal jurisdiction.[251]

Ms. Thomas's battery and false-imprisonment claims raise complex state-law issues. Both claims are premised on the seizure that occurred after Ms. Thomas tried to leave the conference room.[252] Both claims could turn on whether Defendants' actions are considered reasonable under Arkansas law. That's because Arkansas's citizen-arrest statute would foreclose both claims, and the applicability of that statute depends on whether Defendants had "reasonable grounds for believing that" Ms. Thomas had "committed a felony."[253]

To be sure, there's a great deal of overlap between the federal and state-law reasonableness analyses.[254] But it's also possible that determining whether a belief is reasonable for purposes of Arkansas's citizen-arrest statute (especially as a defense to the intentional torts of battery and false imprisonment) would significantly depart from the Fourth Amendment analysis by requiring consideration of the Defendants' mental states at the time of the seizure. Such a departure would be consistent with other differences between federal and Arkansas law—for example, the federal qualified-immunity analysis is purely objective, while state-law immunity standards require a plaintiff to prove that the defendant acted with a culpable state of mind.[255]

Additionally, regardless of the merits of the battery and false-imprisonment claims, the state-law immunity analysis that is likely required provides other unique, complex questions of state law. Most notably, Arkansas's state-employee-tort-immunity statute conditions Ms.

---

[251] *See Starkey v. Amber Enters.*, 987 F.3d 758, 766 (8th Cir. 2021); *EEOC v. Con-Way Freight*, 622 F.3d 933, 938 (8th Cir. 2010); *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 477 (8th Cir. 2009).

[252] *See* Br. in Supp. of Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 51) at 21–22.

[253] Ark. Code Ann. § 16-81-106(d).

[254] *See Mendenhall v. Skaggs Cos., Inc.*, 285 Ark. 236, 238–39, 685 S.W.2d 805, 806–07 (1985).

[255] *See Thurairajah v. City of Fort Smith*, 3 F.4th 1017, 1023–24 (8th Cir. 2021).

Thomas's ability to recover financially on the existence of any applicable insurance policies.[256] And this Court has previously noted that it isn't clear under Arkansas Supreme Court precedent when a given insurance policy opens the door for a plaintiff to recover monetary damages.[257]

The relative merits of state-court adjudication is further suggested by the very nature of Ms. Thomas's claims. Ms. Thomas's case implicates all three branches of Arkansas's government. She is trying to enforce limitations on officials' authority to manage employees and investigate crimes—the two primary exercises of executive authority. The limitations she wishes to enforce arise from Arkansas's common law, which is "the primary concern of" the Arkansas Supreme Court.[258] And its possible, though far from clear, that the Arkansas General Assembly has abrogated or altered any applicable common law rules by enacting the citizen-arrest and state-employee-tort-immunity statutes. Arkansas's courts should be the first to say whether and to what extent Arkansas law subjects state-government employers to individual tort liability in a case like this. Accordingly, the Court declines to exercise supplemental jurisdiction over the battery and false-imprisonment claims.[259]

## CONCLUSION

Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part. Defendants are entitled to judgment in their favor as to all of Ms. Thomas's federal § 1983 claims

---

[256] *See id.* at 1023 (discussing Ark. Code Ann. § 19-10-305(a)).

[257] *See Calvin v. Randall*, Case No. 4:21-CV-00224-LPR, 2022 WL 839053, at *6–8 & nn.66–69 (E.D. Ark. Mar. 21, 2022) (discussing the Arkansas Supreme Court's state- and municipal-employee-immunity precedents).

[258] *Shannon v. Wilson*, 329 Ark. 143, 151, 947 S.W.2d 349, 353 (1997).

[259] Ms. Thomas is not prejudiced by this dismissal. She has anywhere from thirty days to one year to bring the battery and false-imprisonment claims in Arkansas state court. *See* 28 U.S.C. § 1367(d) (providing for a thirty-day tolling of the state-law statute of limitations unless state law provides for a longer period of time); Ark. Code Ann. § 16-56-126 (giving a plaintiff who "suffers a nonsuit" one year to refile the action); *Oxford v. Perry*, 340 Ark. 577, 582–83, 13 S.W.3d 567, 570 (2000) (stating that § 16-56-126 covers a "dismissal without prejudice when the statute-of-limitations would otherwise bar the suit.").

and state constitutional claims *except* that Warden Culclager must stand trial on Ms. Thomas's First Amendment retaliatory-seizure claim and her Fourth Amendment unlawful-seizure claim (and the corresponding state constitutional claims).  Defendants are entitled to summary judgment in their favor on Ms. Thomas's invasion-of-privacy claim under Arkansas common law.  The Court declines to exercise supplemental jurisdiction over Ms. Thomas's battery and false-imprisonment claims.

IT IS SO ORDERED this 13th day of March 2023.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE